# FARETTA *v.* CALIFORNIA

No. 73–5772. Argued November 19, 1974—Decided June 30, 1975

*Jerome B. Falk, Jr.,* by appointment of the Court, 417 U. S. 906, argued the cause for petitioner. With him on the briefs was *Roger S. Hanson.*

*Howard J. Schwab,* Deputy Attorney General of California, argued the cause for respondent. With him on the brief were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *S. Clark Moore,* Assistant Attorney General, and *Russell Iungerich* and *Donald J. Oeser,* Deputy Attorneys General.*

---

*\*John E. Thorne, pro se,* filed a brief as *amicus curiae.*

Mr. Justice Stewart delivered the opinion of the Court.

The Sixth and Fourteenth Amendments of our Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment. This clear constitutional rule has emerged from a series of cases decided here over the last 50 years.[1] The question before us now is whether a defendant in a state criminal trial has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so. Stated another way, the question is whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense. It is not an easy question, but we have concluded that a State may not constitutionally do so.

I

Anthony Faretta was charged with grand theft in an information filed in the Superior Court of Los Angeles County, Cal. At the arraignment, the Superior Court Judge assigned to preside at the trial appointed the public defender to represent Faretta. Well before the date of trial, however, Faretta requested that he be permitted to represent himself. Questioning by the judge revealed that Faretta had once represented himself in a criminal prosecution, that he had a high school education, and that he did not want to be represented by the public defender because he believed that that office was "very loaded down with . . . a heavy case load." The judge

---

[1] See, *e. g., Powell* v. *Alabama,* 287 U. S. 45; *Johnson* v. *Zerbst,* 304 U. S. 458; *Betts* v. *Brady,* 316 U. S. 455; *Gideon* v. *Wainwright,* 372 U. S. 335; *Argersinger* v. *Hamlin,* 407 U. S. 25.

responded that he believed Faretta was "making a mistake" and emphasized that in further proceedings Faretta would receive no special favors.[2] Nevertheless, after establishing that Faretta wanted to represent himself and did not want a lawyer, the judge, in a "preliminary ruling," accepted Faretta's waiver of the assistance of counsel. The judge indicated, however, that he might reverse this ruling if it later appeared that Faretta was unable adequately to represent himself.

Several weeks thereafter, but still prior to trial, the judge *sua sponte* held a hearing to inquire into Faretta's ability to conduct his own defense, and questioned him specifically about both the hearsay rule and the state law governing the challenge of potential jurors.[3] After con-

---

[2] The judge informed Faretta:

"You are going to follow the procedure. You are going to have to ask the questions right. If there is an objection to the form of the question and it is properly taken, it is going to be sustained. We are going to treat you just like a gentleman. We are going to respect you. We are going to give you every chance, but you are going to play with the same ground rules that anybody plays. And you don't know those ground rules. You wouldn't know those ground rules any more than any other lawyer will know those ground rules until he gets out and tries a lot of cases. And you haven't done it."

[3] The colloquy was as follows:

"THE COURT: In the Faretta matter, I brought you back down here to do some reconsideration as to whether or not you should continue to represent yourself.

"How have you been getting along on your research?

"THE DEFENDANT: Not bad, your Honor.

"Last night I put in the mail a 995 motion and it should be with the Clerk within the next day or two.

"THE COURT: Have you been preparing yourself for the intricacies of the trial of the matter?

"THE DEFENDANT: Well, your Honor, I was hoping that the case could possibly be disposed of on the 995.

"Mrs. Ayers informed me yesterday that it was the Court's policy to hear the pretrial motions at the time of trial. If possible, your

sideration of Faretta's answers, and observation of his demeanor, the judge ruled that Faretta had not made an intelligent and knowing waiver of his right to the assist-

Honor, I would like a date set as soon as the Court deems adequate after they receive the motion, sometime before trial.

"THE COURT: Let's see how you have been doing on your research.

"How many exceptions are there to the hearsay rule?

"THE DEFENDANT: Well, the hearsay rule would, I guess, be called the best evidence rule, your Honor. And there are several exceptions in case law, but in actual statutory law, I don't feel there is none.

"THE COURT: What are the challenges to the jury for cause?

"THE DEFENDANT: Well, there is twelve peremptory challenges.

"THE COURT: And how many for cause?

"THE DEFENDANT: Well, as many as the Court deems valid.

"THE COURT: And what are they? What are the grounds for challenging a juror for cause?

"THE DEFENDANT: Well, numerous grounds to challenge a witness—I mean, a juror, your Honor, one being the juror is perhaps suffered, was a victim of the same type of offense, might be prejudiced toward the defendant. Any substantial ground that might make the juror prejudice[d] toward the defendant.

"THE COURT: Anything else?

"THE DEFENDANT: Well, a relative perhaps of the victim.

"THE COURT: Have you taken a look at that code section to see what it is?

"THE DEFENDANT: Challenge a juror?

"THE COURT: Yes.

"THE DEFENDANT: Yes, your Honor. I have done—

"THE COURT: What is the code section?

"THE DEFENDANT: On voir diring a jury, your Honor?

"THE COURT: Yes.

"THE DEFENDANT: I am not aware of the section right offhand.

"THE COURT: What code is it in?

"THE DEFENDANT: Well, the research I have done on challenging would be in Witkins Jurisprudence.

"THE COURT: Have you looked at any of the codes to see where these various things are taken up?

ance of counsel, and also ruled that Faretta had no constitutional right to conduct his own defense.[4] The judge, accordingly, reversed his earlier ruling permitting self-representation and again appointed the public defender to represent Faretta. Faretta's subsequent request for leave to act as cocounsel was rejected, as were his efforts to make certain motions on his own behalf.[5] Throughout

"THE DEFENDANT: No, your Honor, I haven't.

"THE COURT: Have you looked in any of the California Codes with reference to trial procedure?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: What codes?

"THE DEFENDANT: I have done extensive research in the Penal Code, your Honor, and the Civil Code.

"THE COURT: If you have done extensive research into it, then tell me about it.

"THE DEFENDANT: On empaneling a jury, your Honor?

"THE COURT: Yes.

"THE DEFENDANT: Well, the District Attorney and the defendant, defense counsel, has both the right to 12 peremptory challenges of a jury. These 12 challenges are undisputable. Any reason that the defense or prosecution should feel that a juror would be inadequate to try the case or to rule on a case, they may then discharge that juror.

"But if there is a valid challenge due to grounds of prejudice or some other grounds, that these aren't considered in the 12 peremptory challenges. There are numerous and the defendant, the defense and the prosecution both have the right to make any inquiry to the jury as to their feelings toward the case."

[4] The judge concluded:

"[T]aking into consideration the recent case of People versus Sharp, where the defendant apparently does not have a constitutional right to represent himself, the Court finds that the ends of justice and requirements of due process require that the prior order permitting the defendant to represent himself in pro per should be and is hereby revoked. That privilege is terminated."

. [5] Faretta also urged without success that he was entitled to counsel of his choice, and three times moved for the appointment of a lawyer other than the public defender. These motions, too, were denied.

the subsequent trial, the judge required that Faretta's defense be conducted only through the appointed lawyer from the public defender's office. At the conclusion of the trial, the jury found Faretta guilty as charged, and the judge sentenced him to prison.

The California Court of Appeal, relying upon a then-recent California Supreme Court decision that had expressly decided the issue,[6] affirmed the trial judge's ruling that Faretta had no federal or state constitutional right

---

[6] *People* v. *Sharp,* 7 Cal. 3d 448, 499 P. 2d 489.

When Sharp was tried the California Constitution expressly provided that the accused in a criminal prosecution had the right "to appear and defend, in person and with counsel." Cal. Const., Art. 1, § 13. In an earlier decision the California Supreme Court had held that this language meant that the accused had the right to appear by himself or with counsel. *People* v. *Mattson,* 51 Cal. 2d 777, 336 P. 2d 937. This view was rejected in *Sharp,* the California Supreme Court there holding that the defendant in a criminal prosecution has no right under the State or the Federal Constitution to represent himself at trial. See generally Y. Kamisar, W. LaFave & J. Israel, Modern Criminal Procedure 57–60 (4th ed. 1974); Note, 10 Calif. Western L. Rev. 196 (1973); Note, 24 Hastings L. J. 431 (1973); Comment, 64 J. Crim. L. 240 (1973).

Although immaterial to the court's decision, shortly before *Sharp* was decided on appeal the California Constitution had been amended to delete the right of self-representation from Art. 1, § 13, and to empower the legislature expressly "to require the defendant in a felony case to have the assistance of counsel." The new statutes on their face require counsel only in capital cases. See Cal. Penal Code §§ 686 (2), 686.1, 859, 987 (1970 and Supp. 1975). In other than capital cases the accused retains by statutory terms a right "to appear and defend in person and with counsel." § 686 (2). However, this language tracks the old language of Art. 1, § 13, of the California Constitution; and in construing the constitutional language in *Sharp* to exclude any right of self-representation under former Art. 1, § 13, of the State Constitution, the California Supreme Court also stated that § 686 (2) does not provide any right of self-representation.

to represent himself.[7] Accordingly, the appellate court affirmed Faretta's conviction. A petition for rehearing was denied without opinion, and the California Supreme Court denied review.[8] We granted certiorari. 415 U. S. 975.

## II

In the federal courts, the right of self-representation has been protected by statute since the beginnings of our Nation. Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92, enacted by the First Congress and signed by President Washington one day before the Sixth Amend-

---

[7] The Court of Appeal also held that the trial court had not "abused its discretion in concluding that Faretta had not made a knowing and intelligent waiver of his right to be represented by counsel," since "Faretta did not appear aware of the possible consequences of waiving the opportunity for skilled and experienced representation at trial."

[8] The California courts' conclusion that Faretta had no constitutional right to represent himself was made in the context of the following not unusual rules of California criminal procedure: An indigent criminal defendant has no right to appointed counsel of his choice. See *Drumgo* v. *Superior Court,* 8 Cal. 3d 930, 506 P. 2d 1007; *People* v. *Miller,* 7 Cal. 3d 562, 574, 498 P. 2d 1089, 1097; *People* v. *Massie,* 66 Cal. 2d 899, 910, 428 P. 2d 869, 876–877; *People* v. *Taylor,* 259 Cal. App. 2d 448, 450–451, 66 Cal. Rptr. 514, 515–517. The appointed counsel manages the lawsuit and has the final say in all but a few matters of trial strategy. See, *e. g., People* v. *Williams,* 2 Cal. 3d 894, 905, 471 P. 2d 1008, 1015; *People* v. *Foster,* 67 Cal. 2d 604, 606–607, 432 P. 2d 976, 977–978; *People* v. *Monk,* 56 Cal. 2d 288, 299, 363 P. 2d 865, 870–871; see generally *Rhay* v. *Browder,* 342 F. 2d 345, 349 (CA9). A California conviction will not be reversed on grounds of ineffective assistance of counsel except in the extreme case where the quality of representation was so poor as to render the trial a "farce or a sham." *People* v. *Ibarra,* 60 Cal. 2d 460, 386 P. 2d 487; see *People* v. *Miller, supra,* at 573, 498 P. 2d, at 1096–1097; *People* v. *Floyd,* 1 Cal. 3d 694, 709, 464 P. 2d 64, 73; *People* v. *Hill,* 70 Cal. 2d 678, 689, 452 P. 2d 329, 334; *People* v. *Reeves,* 64 Cal. 2d 766, 774, 415 P. 2d 35, 39.

ment was proposed, provided that "in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of . . . counsel . . . ." The right is currently codified in 28 U. S. C. § 1654.

With few exceptions, each of the several States also accords a defendant the right to represent himself in any criminal case.[9] The Constitutions of 36 States explicitly confer that right.[10] Moreover, many state courts have

---

[9] See, e. g., *Mackreth* v. *Wilson*, 31 Ala. App. 191, 15 So. 2d 112; *Cappetta* v. *State*, 204 So. 2d 913 (Fla. Dist. Ct. App.); *Lockard* v. *State*, 92 Idaho 813, 451 P. 2d 1014; *People* v. *Nelson*, 47 Ill. 2d 570, 268 N. E. 2d 2; *Blanton* v. *State*, 229 Ind. 701, 98 N. E. 2d 186; *Westberry* v. *State*, 254 A. 2d 44 (Me.); *Allen* v. *Commonwealth*, 324 Mass. 558, 87 N. E. 2d 192; *People* v. *Haddad*, 306 Mich. 556, 11 N. W. 2d 240; *State* v. *McGhee*, 184 Neb. 352, 167 N. W. 2d 765; *Zasada* v. *State*, 19 N. J. Super. 589, 89 A. 2d 45; *People* v. *McLaughlin*, 291 N. Y. 480, 53 N. E. 2d 356; *State* v. *Pritchard*, 227 N. C. 168, 41 S. E. 2d 287; *State* v. *Hollman*, 232 S. C. 489, 102 S. E. 2d 873; *State* v. *Thomlinson*, 78 S. D. 235, 100 N. W. 2d 121; *State* v. *Penderville*, 2 Utah 2d 281, 272 P. 2d 195; *State* v. *Woodall*, 5 Wash. App. 901, 491 P. 2d 680. See generally Annot., 77 A. L. R. 2d 1233 (1961); 5 R. Anderson, Wharton's Criminal Law and Procedure § 2016 (1957).

[10] Some States grant the accused the right to be heard, or to defend, in person *and* by counsel: Ariz. Const., Art. 2, § 24; Ark. Const., Art. 2, § 10; Colo. Const., Art. 2, § 16; Conn. Const., Art. 1, § 8; Del. Const., Art. 1, § 7; Idaho Const., Art. 1, § 13; Ill. Const., Art. 1, § 8; Ind. Const., Art. 1, § 13; Ky. Const. Bill of Rights, § 11; Mo. Const., Art. 1, § 18 (a); Mont. Const., Art. 3, § 16; Nev. Const., Art. 1, § 8; N. H. Const., pt. 1, Art. 15; N. M. Const., Art. 2, § 14; N. Y. Const., Art. 1, § 6; N. D. Const., Art. 1, § 13; Ohio Const., Art. 1, § 10; Okla. Const., Art. 2, § 20; Ore. Const., Art. 1, § 11; Pa. Const., Art. 1, § 9; S. D. Const., Art. 6, § 7; Tenn. Const., Art. 1, § 9; Utah Const., Art. 1, § 12; Vt. Const., c. 1, Art. 10; Wis. Const., Art. 1, § 7; see La. Const., Art. 1, § 9.

Others grant the right to defend in person *or* by counsel: Kan.

814

expressed the view that the right is also supported by the Constitution of the United States.[11]

This Court has more than once indicated the same view. In *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 279, the Court recognized that the Sixth Amendment right to the assistance of counsel implicitly embodies a "correlative right to dispense with a lawyer's help." The defendant in that case, indicted for federal mail fraud violations, insisted on conducting his own defense without benefit of counsel. He also requested a bench trial and signed a waiver of his right to trial by jury. The prosecution consented to the waiver of a jury, and the waiver was accepted by the court. The defendant was convicted, but the Court of Appeals reversed the conviction on the ground that a person accused of a felony could not competently waive his right to trial by jury except upon the advice of a lawyer. This Court reversed and reinstated the conviction, holding that "an accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury, and so likewise may he competently and intelligently waive his Constitutional right to assistance of counsel." *Id.,* at 275.

The *Adams* case does not, of course, necessarily resolve the issue before us. It held only that "the Constitution

Const. Bill of Rights, § 10; Mass. Const., pt. 1, Art. 12; Neb. Const., Art. 1, § 11; Wash. Const., Art. 1, § 22.

Still others provide the accused the right to defend either by himself, by counsel, or both: Ala. Const., Art. 1, § 6; Fla. Const., Art. 1, § 16; Me. Const., Art. 1, § 6; Miss. Const., Art. 3, § 26; S. C. Const., Art. 1, § 14; Tex. Const., Art. 1, § 10.

[11] See, *e. g., Lockard* v. *State, supra; People* v. *Nelson, supra; Blanton* v. *State, supra; Zasada* v. *State, supra; People* v. *McLaughlin, supra; State* v. *Mems,* 281 N. C. 658, 190 S. E. 2d 164; *State* v. *Verna,* 9 Ore. App. 620, 498 P. 2d 793.

does not force a lawyer upon a defendant." *Id.*, at 279.[12] Whether the Constitution forbids a State from forcing a lawyer upon a defendant is a different question. But the Court in *Adams* did recognize, albeit in dictum, an affirmative right of self-representation:

> "The right to assistance of counsel and the *correlative right to dispense with a lawyer's help* are not legal formalisms. They rest on considerations that go to the substance of an accused's position before the law. . . .
>
> ". . . What were contrived as protections for the accused should not be turned into fetters. . . . To deny an accused a choice of procedure in circumstances in which he, though a layman, is as capable as any lawyer of making an intelligent choice, is to impair the worth of great Constitutional safeguards by treating them as empty verbalisms.
>
> ". . . When the administration of the criminal law . . . is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards . . . is to imprison a man in his privileges and call it the Constitution." *Id.*, at 279–280 (emphasis added).

In other settings as well, the Court has indicated that

---

[12] The holding of *Adams* was reaffirmed in a different context in *Carter* v. *Illinois*, 329 U. S. 173, 174–175, where the Court again adverted to the right of self-representation:

"Neither the historic conception of Due Process nor the vitality it derives from progressive standards of justice denies a person *the right to defend himself* or to confess guilt. Under appropriate circumstances the Constitution requires that counsel be tendered; it does not require that under all circumstances counsel be forced upon a defendant." (Emphasis added.) See also *Moore* v. *Michigan*, 355 U. S. 155, 161.

a defendant has a constitutionally protected right to represent himself in a criminal trial. For example, in *Snyder* v. *Massachusetts,* 291 U. S. 97, the Court held that the Confrontation Clause of the Sixth Amendment gives the accused a right to be present at all stages of the proceedings where fundamental fairness might be thwarted by his absence. This right to "presence" was based upon the premise that the "defense may be made easier if the accused is permitted to be present at the examination of jurors or the summing up of counsel, *for it will be in his power,* if present, to give advice or suggestion or *even to supersede his lawyers altogether and conduct the trial himself." Id.,* at 106 (emphasis added). And in *Price* v. *Johnston,* 334 U. S. 266, the Court, in holding that a convicted person had no absolute right to argue his own appeal, said this holding was in "sharp contrast" to his "recognized privilege of conducting his own defense at the trial." *Id.,* at 285.

The United States Courts of Appeals have repeatedly held that the right of self-representation is protected by the Bill of Rights. In *United States* v. *Plattner,* 330 F. 2d 271, the Court of Appeals for the Second Circuit emphasized that the Sixth Amendment grants the accused the rights of confrontation, of compulsory process for witnesses in his favor, and of assistance of counsel as minimum procedural requirements in federal criminal prosecutions. The right to the assistance of counsel, the court concluded, was intended to supplement the other rights of the defendant, and not to impair "the absolute and primary right to conduct one's own defense *in propria persona." Id.,* at 274. The court found support for its decision in the language of the 1789 federal statute; in the statutes and rules governing criminal procedure, see 28 U. S. C. § 1654, and Fed. Rule Crim. Proc. 44; in the many state constitutions that expressly guarantee self-

representation; and in this Court's recognition of the right in *Adams* and *Price*. On these grounds, the Court of Appeals held that implicit in the Fifth Amendment's guarantee of due process of law, and implicit also in the Sixth Amendment's guarantee of a right to the assistance of counsel, is "the right of the accused personally to manage and conduct his own defense in a criminal case." 330 F. 2d, at 274. See also *United States ex rel. Maldonado* v. *Denno,* 348 F. 2d 12, 15 (CA2); *MacKenna* v. *Ellis,* 263 F. 2d 35, 41 (CA5); *United States* v. *Sternman,* 415 F. 2d 1165, 1169–1170 (CA6); *Lowe* v. *United States,* 418 F. 2d 100, 103 (CA7); *United States* v. *Warner,* 428 F. 2d 730, 733 (CA8); *Haslam* v. *United States,* 431 F. 2d 362, 365 (CA9); compare *United States* v. *Dougherty,* 154 U. S. App. D. C. 76, 86, 473 F. 2d 1113, 1123 (intimating right is constitutional but finding it unnecessary to reach issue) with *Brown* v. *United States,* 105 U. S. App. D. C. 77, 79–80, 264 F. 2d 363, 365–366 (plurality ·opinion stating right is no more than statutory in nature).

This Court's past recognition of the right of self-representation, the federal-court authority holding the right to be of constitutional dimension, and the state constitutions pointing to the right's fundamental nature form a consensus not easily ignored. "[T]he mere fact that a path is a beaten one," Mr. Justice Jackson once observed, "is a persuasive reason for following it." [13] We confront here a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so.

---

[13] Jackson, Full Faith and Credit—The Lawyer's Clause of the Constitution, 45 Col. L. Rev. 1, 26 (1945).

## III

This consensus is soundly premised. The right of self-representation finds support in the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged.

### A

The Sixth Amendment includes a compact statement of the rights necessary to a full defense:

> "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

Because these rights are basic to our adversary system of criminal justice, they are part of the "due process of law" that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States.[14] The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice—through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence. In short, the Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it. See *California* v. *Green,* 399 U. S. 149, 176 (Harlan, J., concurring).

---

[14] *Gideon* v. *Wainwright,* 372 U. S. 335, and *Argersinger* v. *Hamlin,* 407 U. S. 25 (right to counsel); *Pointer* v. *Texas,* 380 U. S. 400 (right of confrontation); *Washington* v. *Texas,* 388 U. S. 14 (right to compulsory process). See also *In re Oliver,* 333 U. S. 257, 273.

The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment.[15] The right to de-

---

[15] This Court has often recognized the constitutional stature of rights that, though not literally expressed in the document, are essential to due process of law in a fair adversary process. It is now accepted, for example, that an accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings, Snyder v. Massachusetts, 291 U. S. 97; to testify on his own behalf, see Harris v. New York, 401 U. S. 222, 225; Brooks v. Tennessee, 406 U. S. 605, 612; cf. Ferguson v. Georgia, 365 U. S. 570; and to be convicted only if his guilt is proved beyond a reasonable doubt, In re Winship, 397 U. S. 358; Mullaney v. Wilbur, 421 U. S. 684.

The inference of rights is not, of course, a mechanical exercise. In Singer v. United States, 380 U. S. 24, the Court held that an accused has no right to a bench trial, despite his capacity to waive his right to a jury trial. In so holding, the Court stated that "[t]he ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right." Id., at 34–35. But that statement was made only after the Court had concluded that the Constitution does not affirmatively protect any right to be tried by a judge. Recognizing that an implied right must arise independently from the design and history of the constitutional text, the Court searched for, but could not find, any "indication that the colonists considered the ability to waive a jury trial to be of equal importance to the right to demand one." Id., at 26. Instead, the Court could locate only "isolated instances" of a right to trial by judge, and concluded that these were "clear departures from the common law." Ibid.

We follow the approach of Singer here. Our concern is with an

fend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

The counsel provision supplements this design. It speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; [16] and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. Cf. *Henry* v. *Mississippi*, 379 U. S. 443, 451; *Brookhart* v. *Janis*, 384 U. S. 1, 7–8; *Fay* v. *Noia*, 372 U. S. 391, 439. This allocation can only be justified, however, by the defendant's consent, at the

*independent* right of self-representation. We do not suggest that this right arises mechanically from a defendant's power to waive the right to the assistance of counsel. See *supra*, at 814–815. On the contrary, the right must be independently found in the structure and history of the constitutional text.

[16] Such a result would sever the concept of counsel from its historic roots.. The first lawyers were personal friends of the litigant, brought into court by him so that he might "take 'counsel' with them" before pleading. 1 F. Pollock & F. Maitland, The History of English Law 211 (2d ed. 1909). Similarly, the first "attorneys" were personal agents, often lacking any professional training, who were appointed by those litigants who had secured royal permission to carry on their affairs through a representative, rather than personally. *Id.,* at 212–213.

outset, to accept counsel as his representative. An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense.

## B

The Sixth Amendment, when naturally read, thus implies a right of self-representation. This reading is reinforced by the Amendment's roots in English legal history.

In the long history of British criminal jurisprudence, there was only one tribunal that ever adopted a practice of forcing counsel upon an unwilling defendant in a criminal proceeding. The tribunal was the Star Chamber. That curious institution, which flourished in the late 16th and early 17th centuries, was of mixed executive and judicial character, and characteristically departed from common-law traditions. For those reasons, and because it specialized in trying "political" offenses, the Star Chamber has for centuries symbolized disregard of basic individual rights.[17] The Star Chamber not merely allowed but required defendants to have counsel. The defendant's answer to an indictment was not accepted unless it was signed by counsel. When counsel refused to sign the answer, for whatever reason, the defendant was

---

[17] "The court of star chamber was an efficient, somewhat arbitrary arm of royal power. It was at the height of its career in the days of the Tudor and Stuart kings. Star chamber stood for swiftness and power; it was not a competitor of the common law so much as a limitation on it—a reminder that high state policy could not safely be entrusted to a system so chancy as English law. . . ." L. Friedman, A History of American Law 23 (1973). See generally 5 W. Holdsworth, A History of English Law 155–214 (1927).

considered to have confessed.[18] Stephen commented on this procedure: "There is something specially repugnant to justice in using rules of practice in such a manner as

---

[18] "The proceedings before the Star Chamber began by a Bill 'engrossed in parchment and filed with the clerk of the court.' It must, like the other pleadings, be signed by counsel . . . . However, counsel were obliged to be careful what they signed. If they put their hands to merely frivolous pleas, or otherwise misbehaved themselves in the conduct of their cases, they were liable to rebuke, suspension, a fine, or imprisonment." Holdsworth, *supra*, n. 17, at 178–179. Counsel, therefore, had to be cautious that any pleadings they signed would not unduly offend the Crown. See 1 J. Stephen, A History of the Criminal Law of England 340–341 (1883).

This presented not merely a hypothetical risk for the accused. Stephen gives the following account of a criminal libel trial in the Star Chamber:

"In 1632 William Prynne was informed against for his book called *Histrio Mastix*. Prynne's answer was, amongst other things, that his book had been licensed, and one of the counsel, Mr. Holbourn, apologised, not without good cause, for his style. . . . His trial was, like the other Star Chamber proceedings, perfectly decent and quiet, but the sentence can be described only as monstrous. He was sentenced to be disbarred and deprived of his university degrees; to stand twice in the pillory, and to have one ear cut off each time; to be fined £5,000; and to be perpetually imprisoned, without books, pen, ink, or paper. . . .

"Five years after this, in 1637, Prynne, Bastwick, and Burton, were tried for libel, and were all sentenced to the same punishment as Prynne had received in 1632, Prynne being branded on the cheeks instead of losing his ears.

"The procedure in this case appears to me to have been as harsh as the sentence was severe, though I do not think it has been so much noticed. . . . Star Chamber defendants were not only allowed counsel, but were required to get their answers signed by counsel. The effect of this rule, and probably its object was, that no defence could be put before the Court which counsel would not take the responsibility of signing—a responsibility which, at that time, was extremely serious. If counsel would not sign the defendant's answer he was taken to have confessed the information. Prynne's answer was of such a character that one of the counsel assigned to him

to debar a prisoner from defending himself, especially when the professed object of the rules so used is to provide for his defence." 1 J. Stephen, A History of the Criminal Law of England 341–342 (1883). The Star Chamber was swept away in 1641 by the revolutionary fervor of the Long Parliament. The notion of obligatory counsel disappeared with it.

By the common law of that time, it was not representation by counsel but self-representation that was the practice in prosecutions for serious crime. At one time, every litigant was required to "appear before the court in his own person and conduct his own cause in his own words." [19] While a right to counsel developed early in civil cases and in cases of misdemeanor, a prohibition against the assistance of counsel continued for centuries in prosecutions for felony or treason.[20] Thus, in the 16th and 17th centuries the accused felon or traitor stood alone, with neither counsel nor the benefit of other rights—to notice, confrontation, and compulsory process—that we now associate with a genuinely fair adversary proceeding. The trial was merely a "long argument between the prisoner and the

refused to sign it at all, and the other did not sign it till after the proper time. Bastwick could get no one to sign his answer. Burton's answer was signed by counsel, but was set aside as impertinent. Upon the whole, the case was taken to be admitted by all the three, and judgment was passed on them accordingly. . . ." Stephen, *supra*, at 340–341.

That Prynne's defense was foreclosed by the refusal of assigned counsel to endorse his answer is all the more shocking when it is realized that Prynne was himself a lawyer. I. Brant, The Bill of Rights 106 (1965). On the operation of the Star Chamber generally, see Barnes, Star Chamber Mythology, 5 Am. J. Legal Hist. 1–11 (1961), and Barnes, Due Process and Slow Process in the Late Elizabethan-Early Stuart Star Chamber, 6 Am. J. Legal Hist. 221–249, 315–346 (1962).

[19] Pollock & Maitland, *supra*, n. 16, at 211.

[20] *Ibid.* See also Stephen, *supra*, n. 18, at 341.

counsel for the Crown." [21] As harsh as this now seems, at least "the prisoner was allowed to make what statements he liked. . . . Obviously this public oral trial presented many more opportunities to a prisoner than the secret enquiry based on written depositions, which, on the continent, had taken the place of a trial. . . ." [22]

With the Treason Act of 1695, there began a long and important era of reform in English criminal procedure. The 1695 statute granted to the accused traitor the rights to a copy of the indictment, to have his witnesses testify under oath, and "to make . . . full Defence, by Counsel learned ·in the Law." [23] It also provided for court appointment of counsel, *but only if the accused so desired.*[24]

---

[21] *Id.,* at 326.

The trial would begin with accusations by counsel for the Crown. The prisoner usually asked, and was granted, the privilege of answering separately each matter alleged against him:

"[T]he trial became a series of excited altercations between the prisoner and the different counsel opposed to him. Every statement of counsel operated as a question to the prisoner, . . . the prisoner either admitting or denying or explaining what was alleged against him. The result was that . . . the examination of the prisoner . . . was the very essence of the trial, ·and his answers regulated the production of the evidence . . . . As the argument proceeded the counsel [for the Crown] would frequently allege matters which the prisoner denied and called upon them to prove. The proof was usually given by reading depositions, confessions of accomplices, letters, and the like . . . . When the matter had been fully inquired into . . . the presiding judge 'repeated' or summed up to the jury the matters alleged against the prisoner, and the answers given by him; and the jury gave their verdict." *Id.,* at 325–326.

[22] Holdsworth, *supra,* n. 17, at 195–196.

[23] 7 Will. 3, c. 3, § 1. The right to call witnesses under oath was extended to felony cases by statute in 1701. 1 Anne, Stat. 2, c. 9, § 3.

[24] The statute provided, in pertinent part, that the accused "shall be received and admitted to make his and their full Defence, by Counsel learned in the Law, and to make any Proof that he or they can

Thus, as new rights developed, the accused retained his established right "to make what statements he liked." [25] The right to counsel was viewed as guaranteeing a choice between representation by counsel and the traditional practice of self-representation. The ban on counsel in felony cases, which had been substantially eroded in the courts,[26] was finally eliminated by statute in 1836.[27] In more recent years, Parliament has provided for court appointment of counsel in serious criminal cases, but only at the accused's request.[28] At no point in this process of reform in England was counsel ever forced upon the

---

produce by lawful Witness or Witnesses, who shall then be upon Oath, for his and their just Defence in that Behalf; and in case any Person or Persons so accused or indicted shall desire Counsel, the Court before whom such Person or Persons shall be tried, or some Judge of that Court, shall and is hereby authorized and required immediately, upon his or their Request, to assign to such Person and Persons such and so many Counsel, not exceeding Two, as the Person or Persons shall desire, to whom such Counsel shall have free Access at all seasonable Hours; any Law or Usage to the contrary notwithstanding."

[25] Holdsworth, *supra*, n. 17, at 195.

[26] In Mary Blandy's 1752 murder trial, for example, the court declared that counsel for the defendant could not only speak on points of law raised by the defense, but could also examine defense witnesses and cross-examine those of the Crown. 18 How. St. Tr. 1117. Later in that century judges often allowed counsel for the accused "to instruct him what questions to ask, or even to ask questions for him, with respect to matters of fact . . . [or] law." 4 W. Blackstone, Commentaries *355–356.

[27] 6 & 7 Will. 4, c. 114, § 1. The statute provided in pertinent part that the accused "shall be admitted, after the Close of the Case for the Prosecution, to make full Answer and Defence thereto by Counsel learned in the Law, or by Attorney in Courts where Attornies practise as Counsel."

[28] See, *e. g.*, Poor Prisoners' Defence Act, 1903, 3 Edw. 7, c. 38, § 1; Poor Prisoners' Defense Act, 1930, 20 & 21 Geo. 5, c. 32; Legal Aid and Advice Act, 1949, 12 & 13 Geo. 6, c. 51.

defendant. The common-law rule, succinctly stated in *R.* v. *Woodward,* [1944] K. B. 118, 119, [1944] 1 All E. R. 159, 160, has evidently always been that "no person charged with a criminal offence can have counsel forced upon him against his will." [29] See 3 Halsbury's Laws of England ¶ 1141, pp. 624–625 (4th ed. 1973); *R.* v. *Maybury,* 11 L. T. R. (n. s.) 566 (Q. B. 1865).

## C

In the American Colonies the insistence upon a right of self-representation was, if anything, more fervent than in England.

The colonists brought with them an appreciation of the virtues of self-reliance and a traditional distrust of lawyers. When the Colonies were first settled, "the lawyer was synonymous with the cringing Attorneys-General and Solicitors-General of the Crown and the arbitrary Justices of the King's Court, all bent on the conviction of those who opposed the King's prerogatives, and twisting the law to secure convictions." [30] This prejudice gained strength in the Colonies where "distrust

---

[29] Counsel had been appointed for the defendant Woodward but withdrew shortly before trial. When the trial court appointed a substitute counsel, the defendant objected: "I would rather not have legal aid. I would rather conduct the case myself." The trial court insisted, however, that the defendant proceed to trial with counsel, and a conviction resulted. On appeal, the Crown did not even attempt to deny a basic right of self-representation, but argued only that the right had been waived when the accused accepted the first counsel. The Court of Appeal rejected this argument: "The prisoner right at the beginning [of the trial] said that he wished to defend himself . . . and he was refused what we think was his right to make his own case to the jury instead of having it made for him by counsel." This, the court held, was an "injustice to the prisoner," and "although there was a good deal of evidence against the prisoner," the court quashed the conviction.

[30] C. Warren, A History of the American Bar 7 (1911).

of lawyers became an institution." [31] Several Colonies prohibited pleading for hire in the 17th century.[32] The prejudice persisted into the 18th century as "the lower classes came to identify lawyers with the upper class." [33] The years of Revolution and Confederation saw an upsurge of antilawyer sentiment, a "sudden revival, after the War of the Revolution, of the old dislike and distrust of lawyers as a class." [34] In the heat of these sentiments the Constitution was forged.

This is not to say that the Colonies were slow to recognize the value of counsel in criminal cases. Colonial judges soon departed from ancient English practice and allowed accused felons the aid of counsel for their defense.[35] At the same time, however, the basic right of

---

[31] D. Boorstin, The Americans; The Colonial Experience 197 (1958).

[32] For example, the Massachusetts Body of Liberties (1641) in Art. 26 provided:

"Every man that findeth himselfe unfit to plead his owne cause in any Court shall have Libertie to imploy any man against whom the Court doth not except, to helpe him, Provided he give him noe fee or reward for his paines. . . ."

Pleading for hire was also prohibited in 17th century Virginia, Connecticut, and the Carolinas. Friedman, *supra,* n. 17, at 81.

[33] *Id.,* at 82.

[34] Warren, *supra,* n. 30, at 212.

[35] For example, Zephaniah Swift, in one of the first American colonial treatises on law, made clear that a right to counsel was recognized in Connecticut. He wrote:

"We have never admitted that cruel and illiberal principle of the common law of England, that when a man is on trial for his life, he shall be refused counsel, and denied those means of defence, which are allowed, when the most trifling pittance of property is in question. The flimsy pretence, that the court are to be counsel for the prisoner will only heighten our indignation at the practice: for it is apparent to the least consideration, that a court can never furnish a

self-representation was never questioned. We have found no instance where a colonial court required a defendant in a criminal case to accept as his representative an unwanted lawyer. Indeed, even where counsel was permitted, the general practice continued to be self-representation.[36]

The right of self-representation was guaranteed in many colonial charters and declarations of rights. These early documents establish that the "right to counsel" meant to the colonists a right to choose between pleading through a lawyer and representing oneself.[37] After the

person accused of a crime with the advice, and assistance necessary to make his defence. . . .

"Our ancestors, when they first enacted their laws respecting crimes, influenced by the illiberal principles which they had imbibed in their native country, denied counsel to prisoners to plead for them to any thing but points of law. It is manifest that there is as much necessity for counsel to investigate matters of fact, as points of law, if truth is to be discovered." 2 Z. Swift, A System of the Laws of the State of Connecticut 398–399 (1796).

Similarly, colonial Virginia at first based its court proceedings on English judicial customs, but "[b]y the middle of the eighteenth century the defendant was permitted advice of counsel if he could afford such services." H. Rankin, Criminal Trial Proceedings in the General Court of Colonial Virginia 67, 89 (1965).

[36] See, e. g., id., at 89–90.

[37] See, e. g., the Massachusetts Body of Liberties, Art. 26 (1641), supra, n. 32.

Similarly, the Concessions and Agreements of West New Jersey, in 1677, provided, for all cases, civil and criminal, "that no person or persons shall be compelled to fee any attorney or councillor to plead his cause, but that all persons have free liberty to plead his own cause, if he please."

The Pennsylvania Frame of Government of 1682, perhaps "the most influential of the Colonial documents protecting individual rights," 1 B. Schwartz, The Bill of Rights: A Documentary History 130 (1971) (hereinafter Schwartz), provided:

"That, in all courts all persons of all persuasions may freely appear in their own way, and according to their own manner, and there

Declaration of Independence, the right of self-representation, along with other rights basic to the making of a defense, entered the new state constitutions in wholesale fashion.[38] The right to counsel was clearly thought to

personally plead their own cause themselves; or, if unable, by their friends . . . ."

That provision was no doubt inspired by William Penn's belief that an accused should go free if he could personally persuade a jury that it would be unjust to convict him. In England, 12 years earlier, Penn, after preaching a sermon in the street, had been indicted and tried for disturbing the peace. Penn conceded that he was "unacquainted with the formality of the law," but requested that he be given a fair hearing and the "liberty of making my defence." The request was granted, Penn represented himself, and although the judges jailed him for contempt, the jury acquitted him of the charge. "The People's Ancient and Just Liberties Asserted, in the Trial of William Penn and William Mead, 1670," reproduced in 1 Schwartz 144, 147. See The Trial of William Penn, 6 How. St. Tr. 951 (1670), cited in *Illinois* v. *Allen,* 397 U. S. 337, 353 (opinion of DOUGLAS, J.).

[38] Article IX of the Pennsylvania Declaration of Rights in 1776 guaranteed "[t]hat in all prosecutions for criminal offences, a man hath a right to be heard by himself and his council . . . ." The Vermont Declaration of Rights (Art. X) in 1777 protected the right of self-representation with virtually identical language. The Georgia Constitution (Art. LVIII) in 1777 declared that its provisions barring the unauthorized practice of law were "not intended to exclude any person from that inherent privilege of every *freeman,* the liberty to plead his own cause." In 1780 the Massachusetts Declaration of Rights, Art. XII, provided that the accused had a right to be heard "by himself, or his counsel at his election." The New Hampshire · Bill of Rights (Art. XV) in 1783 affirmed the right of the accused "to be fully heard in his defence by himself, and counsel." In 1792 the Delaware Constitution (Art. I, § 7) preserved the right in language modeled after Art. IX of the Pennsylvania Declaration of Rights. Similarly, in 1798 Georgia included in its Constitution (Art. III, § 8) a provision that protected the right of the accused to defend "by himself or counsel, or both." Other state constitutions did not express in literal terms a right of self-representation, but those documents granted all defense rights to the accused personally and phrased

830

supplement the primary right of the accused to defend himself,[39] utilizing his personal rights to notice, confrontation, and compulsory process. And when the Colonies or newly independent States provided by statute rather than by constitution for court appointment of counsel in criminal cases, they also meticulously preserved the right of the accused to defend himself personally.[40]

the right of counsel in such fashion as to imply the existence of the antecedent liberty. See Del. Declaration of Rights, § 14 (1776) (right "to be allowed counsel"); Md. Declaration of Rights, Art. XIX (1776) (right "to be allowed counsel"); N. J. Const., Art. XVI (1776) (criminals to have "same privileges of . . . counsel, as their prosecutors"); N. Y. Const., Art. XXXIV (1777) ("shall be allowed counsel").

[39] The Founders believed that self-representation was a basic right of a free people. Underlying this belief was not only the anti-lawyer sentiment of the populace, but also the "natural law" thinking that characterized the Revolution's spokesmen. See P. Kauper, The Higher Law and the Rights of Man in a Revolutionary Society, a lecture in the American Enterprise Institute for Public Policy Research series on the American Revolution, Nov. 7, 1973, extracted in 18 U. of Mich. Law School Law Quadrangle Notes, No. 2, p. 9 (1974). For example, Thomas Paine, arguing in support of the 1776 Pennsylvania Declaration of Rights, said:

"Either party . . . has a natural right to plead his own cause; this right is consistent with safety, therefore it is retained; but the parties may not be able, . . . therefore the civil right of pleading by proxy, that is, by a council, is an appendage to the natural right [of self-representation] . . . ." Thomas Paine on a Bill of Rights, 1777, reprinted in 1 Schwartz 316.

[40] Statutes providing for appointment of counsel on request of the accused were enacted by Delaware in 1719, 1 Laws of the State of Delaware, 1700–1797, p. 66 (Adams 1797); by Pennsylvania in 1718, 3 Stats. at Large of Pennsylvania 199 (Busch 1896); and by South Carolina in 1731, Laws of the Province of South Carolina 518–519 (Trott 1736). Appointment was also the practice in Connecticut in the latter part of the 18th century; appointment apparently was sometimes made even when the accused failed to request counsel, if he appeared in need of a lawyer, but there is no indication ap-

The recognition of the right of self-representation was not limited to the state lawmakers. As we have noted, § 35 of the Judiciary Act of 1789, signed one day before the Sixth Amendment was proposed, guaranteed in the federal courts the right of all parties to "plead and manage their own causes personally or by the assistance of . . . counsel." 1 Stat. 92. See 28 U. S. C. § 1654. At the time James Madison drafted the Sixth Amendment, some state constitutions guaranteed an accused the right to be heard "by himself" and by counsel; others provided that an accused was to be "allowed" counsel.[41] The various state proposals for the Bill of Rights had similar variations in terminology.[42]

---

pointment was ever made over the objection of the accused. See Swift, *supra,* n. 35, at 392. Free-choice appointment remained the rule as the new Republic emerged. See the 1791 statute of New Hampshire, Laws of New Hampshire 247 (Melcher 1792), and the 1795 statute of New Jersey, § 2, Acts of the Nineteenth General Assembly of the State of New Jersey 1012.

[41] See counsel provisions in n. 38, *supra.*

[42] In ratifying the Constitution, three States urged that a right-to-counsel provision be added by way of amendment. Virginia and North Carolina proposed virtually identical packages of a defendant's rights, each including the provision that an accused be "allowed" counsel. 2 Schwartz 841, 967. The package proposed by New York provided that the accused "ought to . . . have . . . the assistance of Council for his defense." *Id.,* at 913. The idea of proposing amendments upon ratification had begun with the Pennsylvania dissenters from ratification, whose proposed package of a defendant's rights provided for the accused's "right . . . to be heard by himself and his counsel." *Id.,* at 664–665. It can be seen that Madison's precise formulation—"the right . . . to have the Assistance of Counsel for his defence"—varied in phrasing from each of the proposals. "The available debates on the various proposals throw no light on the significance or the interpretation which Congress attributed to the right to counsel." W. Beaney, The Right to Counsel in American Courts 23 (1955).

In each case, however, the counsel provision was embedded in a package of defense rights granted personally to the accused. There is no indication that the differences in phrasing about "counsel" reflected any differences of principle about self-representation. No State or Colony had ever forced counsel upon an accused; no spokesman had ever suggested that such a practice would be tolerable, much less advisable. If anyone had thought that the Sixth Amendment, as drafted, failed to protect the long-respected right of self-representation, there would undoubtedly have been some debate or comment on the issue. But there was none.

In sum, there is no evidence that the colonists and the Framers ever doubted the right of self-representation, or imagined that this right might be considered inferior to the right of assistance of counsel. To the contrary, the colonists and the Framers, as well as their English ancestors, always conceived of the right to counsel as an "assistance" for the accused, to be used at his option, in defending himself. The Framers selected in the Sixth Amendment a form of words that necessarily implies the right of self-representation. That conclusion is supported by centuries of consistent history.

## IV

There can be no blinking the fact that the right of an accused to conduct his own defense seems to cut against the grain of this Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel. See *Powell* v. *Alabama,* 287 U. S. 45; *Johnson* v. *Zerbst,* 304 U. S. 458; *Gideon* v. *Wainwright,* 372 U. S. 335; *Argersinger* v. *Hamlin,* 407 U. S. 25. For it is surely true that the basic thesis of those decisions is that the help of a lawyer is essential to assure

the defendant a fair trial.[43] And a strong argument can surely be made that the whole thrust of those decisions must inevitably lead to the conclusion that a State may constitutionally impose a lawyer upon even an unwilling defendant.

But it is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want. The value of state-appointed counsel was not unappreciated by the Founders,[44] yet the notion of compulsory counsel was utterly foreign to them. And whatever else may be said of those who wrote the Bill of Rights, surely there can be no

---

[43] As stated by Mr. Justice Sutherland in *Powell* v. *Alabama*, 287 U. S. 45:

"Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Id.*, at 69.

[44] See n. 38, *supra*, for colonial appointment statutes that predate the Sixth Amendment. Federal law provided for appointment of counsel in capital cases at the request of the accused as early as 1790, 1 Stat. 118.

doubt that they understood the inestimable worth of free choice.[45]

It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." *Illinois* v. *Allen,* 397 U. S. 337, 350–351 (BRENNAN, J., concurring).[46]

---

[45] See, *e. g.,* U. S. Const., Amdt. 1. Freedom of choice is not a stranger to the constitutional design of procedural protections for a defendant in a criminal proceeding. For example, "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Harris* v. *New York,* 401 U. S. 222, 225. See *Brooks* v. *Tennessee,* 406 U. S. 605, 612; *Ferguson* v. *Georgia,* 365 U. S. 570. Cf. *Brown* v. *United States,* 356 U. S. 148.

[46] We are told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. But the right of self-representation has been recognized from our beginnings by federal law and by most of the States, and no such result has thereby occurred. Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. See *Illinois* v. *Allen,*

## V

When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. *Johnson* v. *Zerbst,* 304 U. S., at 464–465. Cf. *Von Moltke* v. *Gillies,* 332 U. S. 708, 723–724 (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams* v. *United States ex rel. McCann,* 317 U. S., at 279.

Here, weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept

---

397 U. S. 337. Of course, a State may—even over objection by the accused—appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. See *United States* v. *Dougherty,* 154 U. S. App. D. C. 76, 87–89, 473 F. 2d 1113, 1124–1126.

The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law. Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel."

the assistance of counsel, and that Faretta would be required to follow all the "ground rules" of trial procedure.[47] We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on *voir dire*.[48] For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.

In forcing Faretta, under these circumstances, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense. Accordingly, the judgment before us is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE BLACKMUN and MR. JUSTICE REHNQUIST join, dissenting.

This case, like *Herring* v. *New York, post,* p. 853, announced today, is another example of the judicial tendency to constitutionalize what is thought "good." That effort fails on its own terms here, because there is nothing desirable or useful in permitting every accused person, even the most uneducated and inexperienced, to insist upon conducting his own defense to criminal charges.[1] Moreover, there is no constitutional basis for

---

[47] See n. 2, *supra.*

[48] See n. 3, *supra.*

[1] Absent a statute giving a right to self-representation, I believe that trial courts should have discretion under the Constitution to insist upon representation by counsel if the interests of justice so require. However, I would note that the record does not support the Court's characterization of this case as one in which that occurred. Although he requested, and initially was granted, permission to proceed

the Court's holding, and it can only add to the problems of an already malfunctioning criminal justice system. I therefore dissent.

I

The most striking feature of the Court's opinion is that it devotes so little discussion to the matter which it concedes is the core of the decision, that is, discerning an independent basis in the Constitution for the supposed right to represent oneself in a criminal trial.[2] See *ante,* at 818–821, and n. 15. Its ultimate assertion that such a right is tucked between the lines of the Sixth Amendment is contradicted by the Amendment's language and its consistent judicial interpretation.

As the Court seems to recognize, *ante,* at 820, the conclusion that the rights guaranteed by the Sixth Amendment are "personal" to an accused reflects nothing more than the obvious fact that it is he who is on trial and therefore has need of a defense.[3] But neither that nearly

---

*pro se,* petitioner has expressed no dissatisfaction with the lawyer who represented him and has not alleged that his defense was impaired or that his lawyer refused to honor his suggestions regarding how the trial should be conducted. In other words, to use the Court's phrase, petitioner has never contended that *"his* defense" was not fully presented. Instances of overbearing or ineffective counsel can be dealt with without contriving broad constitutional rules of dubious validity.

[2] The Court deliberately, and in my view properly, declines to characterize this case as one in which the defendant was denied a fair trial. See *Herring* v. *New York, post,* at 871 (REHNQUIST, J., dissenting).

[3] The Court's attempt to derive support for its position from the fact that the Sixth Amendment speaks in terms of the "Assistance of Counsel" requires little comment. It is most curious to suggest that an accused who exercises his right to "assistance" has thereby impliedly consented to subject himself to a "master." *Ante,* at 820. And counsel's responsibility to his client and role in the litigation do not vary depending upon whether the accused would have preferred to represent himself.

trivial proposition nor the language of the Amendment, which speaks in uniformly mandatory terms, leads to the further conclusion that the right to counsel is merely supplementary and may be dispensed with at the whim of the accused. Rather, this Court's decisions have consistently included the right to counsel as an integral part of the bundle making up the larger "right to a defense as we know it." For example, in *In re Oliver*, 333 U. S. 257 (1948), the Court reversed a summary contempt conviction at the hands of a "one-man grand jury," and had this to say:

> "We . . . hold that failure to afford the petitioner a reasonable opportunity to defend himself against the charge of false and evasive swearing was a denial of due process of law. A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel." *Id.*, at 273.

See also *Argersinger* v. *Hamlin*, 407 U. S. 25, 27–33 (1972); *Gideon* v. *Wainwright*, 372 U. S. 335, 344 (1963).

The reason for this hardly requires explanation. The fact of the matter is that in all but an extraordinarily small number of cases an accused will lose whatever defense he may have if he undertakes to conduct the trial himself. The Court's opinion in *Powell* v. *Alabama*, 287 U. S. 45 (1932), puts the point eloquently:

> "Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may

be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect." *Id.,* at 69.

Obviously, these considerations do not vary depending upon whether the accused actively desires to be represented by counsel or wishes to proceed *pro se.* Nor is it accurate to suggest, as the Court seems to later in its opinion, that the quality of his representation at trial is a matter with which only the accused is legitimately concerned. See *ante,* at 834. Although we have adopted an adversary system of criminal justice, see *Gideon* v. *Wainwright, supra,* the prosecution is more than an ordinary litigant, and the trial judge is not simply an automaton who insures that technical rules are adhered to. Both are charged with the duty of insuring that justice, in the broadest sense of that term, is achieved in every criminal trial. See *Brady* v. *Maryland,* 373 U. S. 83, 87, and n. 2 (1963); *Berger* v. *United States,* 295 U. S. 78, 88 (1935). That goal is ill-served, and the integrity of and public confidence in the system are undermined, when an easy conviction is obtained due to the defendant's ill-advised decision to waive counsel. The damage thus inflicted is not mitigated by the lame explanation that the defendant simply availed himself of the "freedom" "to go to jail under his own banner . . . ." *United States ex rel.*

840

*Maldonado* v. *Denno,* 348 F. 2d 12, 15 (CA2 1965). The system of criminal justice should not be available as an instrument of self-destruction.

In short, both the "spirit and the logic" of the Sixth Amendment are that every person accused of crime shall receive the fullest possible defense; in the vast majority of cases this command can be honored only by means of the expressly guaranteed right to counsel, and the trial judge is in the best position to determine whether the accused is capable of conducting his defense. True freedom of choice and society's interest in seeing that justice is achieved can be vindicated only if the trial court retains discretion to reject any attempted waiver of counsel and insist that the accused be tried according to the Constitution. This discretion is as critical an element of basic fairness as a trial judge's discretion to decline to accept a plea of guilty. See *Santobello* v. *New York,* 404 U. S. 257, 262 (1971).

II

The Court's attempt to support its result by collecting dicta from prior decisions is no more persuasive than its analysis of the Sixth Amendment. Considered in context, the cases upon which the Court relies to "beat its path" either lead it nowhere or point in precisely the opposite direction.

In *Adams* v. *United States ex rel. McCann,* 317 U. S. 269 (1942), and *Carter* v. *Illinois,* 329 U. S. 173 (1946), the defendants had competently waived counsel but later sought to renounce actions taken by them while proceeding *pro se.* In both cases this Court upheld the convictions, holding that neither an uncounseled waiver of jury trial nor an uncounseled guilty plea is inherently defective under the Constitution. The language which the Court so carefully excises from those opinions relates, not to an affirmative right of self-representation, but to

the consequences of waiver.[4] In *Adams,* for example, Mr. Justice Frankfurter was careful to point out that his reference to a defendant's "correlative right to dispense with a lawyer's help" meant only that "[h]e may waive his Constitutional right to assistance of counsel . . . ," 317 U. S., at 279. See *United States* v. *Warner,* 428 F. 2d 730, 733 (CA8 1970). But, as the Court recognizes, the power to *waive* a constitutional right does not carry with it the right to insist upon its opposite. *Singer* v. *United States,* 380 U. S. 24, 34–35 (1965).

Similarly, in *Carter* the Court's opinion observed that the Constitution "does not require that *under all circumstances* counsel be forced upon a defendant," citing *Adams.* 329 U. S., at 174–175 (emphasis added). I, for one, find this statement impossible to square with the Court's present holding that an accused is absolutely entitled to *dispense* with a lawyer's help under all conditions. Thus, although *Adams* and *Carter* support the Court's conclusion that a defendant who represents himself may not thereafter disaffirm his deliberate trial decisions, see *ante,* at 834–835, n. 46, they provide it no comfort regarding the primary issue in this case.[5]

---

[4] Indeed, the portion of the Court's quotation which warns against turning constitutional protections into "fetters" refers to the right to trial by jury, not the right to counsel. See *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 279 (1942). This Court has, of course, squarely held that there is no constitutional right to dispense with a jury. *Singer* v. *United States,* 380 U. S. 24 (1965).

[5] No more relevant is *Snyder* v. *Massachusetts,* 291 U. S. 97 (1934). The reference in that case to an accused's "power . . . to supersede his lawyers" simply helped explain why his defense might "be made easier" if he were "permitted to be present at the examination of jurors or the summing up of counsel . . . ." *Id.,* at 106. Mr. Justice Cardozo's opinion for the Court made plain that this right was rooted in considerations of fundamental fairness, and was to be distinguished from those conferred by the Confronta-

Far more nearly in point is *Price* v. *Johnston,* 334
U. S. 266 (1948), where this Court held that, although
the courts of appeals possess the power to command
that a prisoner be produced to argue his own appeal,
the exercise of that power is a matter of sound judicial
discretion. An examination of the whole of the Court's
reasoning on this point is instructive:

> "The discretionary nature of the power in ques-
> tion grows out of the fact that a prisoner has no
> absolute right to argue his own appeal or even to
> be present at the proceedings in an appellate court.
> The absence of that right is in sharp contrast to
> his constitutional prerogative of being present in
> person at each significant stage of a felony prosecu-
> tion, and to his recognized privilege of conducting
> his own defense at the trial. Lawful incarceration
> brings about the necessary withdrawal or limitation
> of many privileges and rights, a retraction justified
> by the considerations underlying our penal system.
> Among those so limited is the otherwise unqualified
> right given by § 272 of the Judicial Code, 28 U. S. C.
> § 394 [now § 1654], to parties in all the courts of
> the United States to 'plead and manage their own
> causes personally.' " *Id.,* at 285–286 (citations
> omitted).

It barely requires emphasis that this passage contrasts
the "constitutional prerogative" to be present at trial
with the "recognized privilege" of self-representation, and
strongly implies that the latter arises only from the
federal statute. It is difficult to imagine a position less
consistent with *Price* v. *Johnston* than that taken by
the Court today.

---

tion Clause. See *id.,* at 107. The Court's present reliance on
the *Snyder* dicta is therefore misplaced. See n. 2, *supra.*

The Court of Appeals cases relied upon by the Court are likewise dubious authority for its views. Only one of those cases, *United States* v. *Plattner,* 330 F. 2d 271 (CA2 1964), even attempted a reasoned analysis of the issue, and the decision in that case was largely based upon the misreading of *Adams* and *Price* which the Court perpetuates in its opinion today. See 330 F. 2d, at 275. In every other case cited *ante,* at 817, the Courts of Appeals assumed that the right of self-representation was constitutionally based but found that the right had not been violated and affirmed the conviction under review. It is highly questionable whether such holdings would even establish the law of the Circuits from which they came.

In short, what the Court represents as a well-traveled road is in reality a constitutional trail which it is blazing for the first time today, one that has not even been hinted at in our previous decisions. Far from an interpretation of the Sixth Amendment, it is a perversion of the provision to which we gave full meaning in *Gideon* v. *Wainwright* and *Argersinger* v. *Hamlin.*

### III

Like MR. JUSTICE BLACKMUN, I hesitate to participate in the Court's attempt to use history to take it where legal analysis cannot. Piecing together shreds of English legal history and early state constitutional and statutory provisions, without a full elaboration of the context in which they occurred or any evidence that they were relied upon by the drafters of our Federal Constitution, creates more questions than it answers and hardly provides the firm foundation upon which the creation of new constitutional rights should rest. We are well reminded that this Court once employed an exhaustive analysis of English and colonial practices regarding the

right to counsel to justify the conclusion that it was fundamental to a fair trial and, less than 10 years later, used essentially the same material to conclude that it was not. Compare *Powell* v. *Alabama,* 287 U. S., at 60–65, with *Betts* v. *Brady,* 316 U. S. 455, 465–471 (1942).

As if to illustrate this point, the single historical fact cited by the Court which would appear truly relevant to ascertaining the meaning of the Sixth Amendment proves too much. As the Court points out, *ante,* at 831, § 35 of the Judiciary Act of 1789 provided a statutory right to self-representation in federal criminal trials. The text of the Sixth Amendment, which expressly provides only for a right to counsel, was proposed the day after the Judiciary Act was signed. It can hardly be suggested that the Members of the Congress of 1789, then few in number, were unfamiliar with the Amendment's carefully structured language, which had been under discussion since the 1787 Constitutional Convention. And it would be most remarkable to suggest, had the right to conduct one's own defense been considered so critical as to require constitutional protection, that it would have been left to implication. Rather, under traditional canons of construction, *inclusion* of the right in the Judiciary Act and its *omission* from the constitutional amendment drafted at the same time by many of the same men, supports the conclusion that the omission was intentional.

There is no way to reconcile the idea that the Sixth Amendment impliedly guaranteed the right of an accused to conduct his own defense with the contemporaneous action of the Congress in passing a statute explicitly giving that right. If the Sixth Amendment created a right to self-representation it was unnecessary for Congress to enact any statute on the subject at all.

In this case, therefore, history ought to lead judges to conclude that the Constitution leaves to the judgment of legislatures, and the flexible process of statutory amendment, the question whether criminal defendants should be permitted to conduct their trials *pro se.* See *Betts* v. *Brady, supra.* And the fact that we have not hinted at a contrary view for 185 years is surely entitled to some weight in the scales.[6] Cf. *Jackman* v. *Rosenbaum Co.,* 260 U. S. 22, 31 (1922).

## IV

Society has the right to expect that, when courts find new rights implied in the Constitution, their potential effect upon the resources of our criminal justice system will be considered. However, such considerations are conspicuously absent from the Court's opinion in this case.

It hardly needs repeating that courts at all levels are already handicapped by the unsupplied demand for competent advocates, with the result that it often takes far longer to complete a given case than experienced counsel would require. If we were to assume that there will be widespread exercise of the newly discovered constitutional right to self-representation, it would almost certainly follow that there will be added congestion in the courts and that the quality of justice will suffer. Moreover, the Court blandly assumes that once an accused has elected to defend himself he will be bound by his choice and not be heard to complain of it later. *Ante,* at 834–835, n. 46. This assumption ignores the role of appellate review, for the reported cases are replete with instances of a convicted defendant being relieved of a

---

[6] The fact that Congress has retained a statutory right to self-representation suggests that it has also assumed that the Sixth Amendment does not guarantee such a right. See 28 U. S. C. § 1654.

deliberate decision even when made *with the advice of counsel.* See *Silber* v. *United States,* 370 U. S. 717 (1962). It is totally unrealistic, therefore, to suggest that an accused will always be held to the consequences of a decision to conduct his own defense. Unless, as may be the case, most persons accused of crime have more wit than to insist upon the dubious benefit that the Court confers today, we can expect that many expensive and good-faith prosecutions will be nullified on appeal for reasons that trial courts are now deprived of the power to prevent.[7]

Mr. Justice Blackmun, with whom The Chief Justice and Mr. Justice Rehnquist join, dissenting.

Today the Court holds that the Sixth Amendment guarantees to every defendant in a state criminal trial the right to proceed without counsel whenever he elects to do so. I find no textual support for this conclusion in the language of the Sixth Amendment. I find the historical evidence relied upon by the Court to be unpersuasive, especially in light of the recent history of criminal procedure. Finally, I fear that the right to self-representation constitutionalized today frequently will cause procedural confusion without advancing any significant strategic interest of the defendant. I therefore dissent.

I

The starting point, of course, is the language of the Sixth Amendment:

"In all criminal prosecutions, the accused shall en-

---

[7] Some of the damage we can anticipate from a defendant's ill-advised insistence on conducting his own defense may be mitigated by appointing a qualified lawyer to sit in the case as the traditional "friend of the court." The Court does not foreclose this option. See *ante,* at 834–835, n. 46.

joy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

It is self-evident that the Amendment makes no direct reference to self-representation. Indeed, the Court concedes that the right to self-representation is "not stated in the Amendment in so many words." *Ante,* at 819.

It could be argued that the right to assistance of counsel necessarily carries with it the right to waive assistance of counsel. The Court recognizes, however, *ante,* at 819–820, n. 15, that it has squarely rejected any mechanical interpretation of the Bill of Rights. Mr. Chief Justice Warren, speaking for a unanimous Court in *Singer* v. *United States,* 380 U. S. 24, 34–35 (1965), stated: "The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right."

Where then in the Sixth Amendment does one find this right to self-representation? According to the Court, it is "necessarily implied by the structure of the Amendment." *Ante,* at 819. The Court's chain of inferences is delicate and deserves scrutiny. The Court starts with the proposition that the Sixth Amendment is "a compact statement of the rights necessary to a full defense." *Ante,* at 818. From this proposition the Court concludes that the Sixth Amendment "constitutionalizes the right in an adversary criminal trial to make a defense as we know it." *Ibid.* Up to this point, at least as a general proposition, the Court's reasoning is unexception-

able. The Court, however, then concludes that because the specific rights in the Sixth Amendment are personal to the accused, the accused must have a right to exercise those rights personally. Stated somewhat more succinctly, the Court reasons that because the accused has a personal right to "a defense as we know it," he necessarily has a right to make that defense personally. I disagree. Although I believe the specific guarantees of the Sixth Amendment are personal to the accused, I do not agree that the Sixth Amendment guarantees any particular procedural method of asserting those rights. If an accused has enjoyed a speedy trial by an impartial jury in which he was informed of the nature of the accusation, confronted with the witnesses against him, afforded the power of compulsory process, and represented effectively by competent counsel, I do not see that the Sixth Amendment requires more.

The Court suggests that thrusting counsel upon the accused against his considered wish violates the logic of the Sixth Amendment because counsel is to be an assistant, not a master. The Court seeks to support its conclusion by historical analogy to the notorious procedures of the Star Chamber. The potential for exaggerated analogy, however, is markedly diminished when one recalls that petitioner is seeking an absolute right to self-representation. This is not a case where defense counsel, against the wishes of the defendant or with inadequate consultation, has adopted a trial strategy that significantly affects one of the accused's constitutional rights. For such overbearing conduct by counsel, there is a remedy. *Brookhart* v. *Janis,* 384 U. S. 1 (1966); *Fay* v. *Noia,* 372 U. S. 391, 439 (1963). Nor is this a case where distrust, animosity, or other personal differences between the accused and his would-be counsel have rendered effective representation unlikely or impossible.

See *Brown* v. *Craven*, 424 F. 2d 1166, 1169–1170 (CA9 1970). See also *Anders* v. *California*, 386 U. S. 738 (1967). Nor is this even a case where a defendant has been forced, against his wishes to expend his personal resources to pay for counsel for his defense. See generally *Fuller* v. *Oregon*, 417 U. S. 40 (1974); *James* v. *Strange*, 407 U. S. 128 (1972). Instead, the Court holds that any defendant in any criminal proceeding may insist on representing himself regardless of how complex the trial is likely to be and regardless of how frivolous the defendant's motivations may be. I cannot agree that there is anything in the Due Process Clause or the Sixth Amendment that requires the States to subordinate the solemn business of conducting a criminal prosecution to the whimsical—albeit voluntary—caprice of every accused who wishes to use his trial as a vehicle for personal or political self-gratification.

The Court seems to suggest that so long as the accused is willing to pay the consequences of his folly, there is no reason for not allowing a defendant the right to self-representation. *Ante,* at 834. See also *United States ex rel. Maldonado* v. *Denno*, 348 F. 2d 12, 15 (CA2 1965) ("[E]ven in cases where the accused is harming himself by insisting on conducting his own defense, respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires . . ."). That view ignores the established principle that the interest of the State in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Berger* v. *United States,* 295 U. S. 78, 88 (1935). See also *Singer* v. *United States,* 380 U. S., at 37. For my part, I do not believe that any amount of *pro se* pleading can cure the injury to society of an unjust result, but I do believe that a just result should prove to be an effective balm for almost any frustrated *pro se* defendant.

## II

The Court argues that its conclusion is supported by the historical evidence on self-representation. It is true that self-representation was common, if not required, in 18th century English and American prosecutions. The Court points with special emphasis to the guarantees of self-representation in colonial charters, early state constitutions, and § 35 of the first Judiciary Act as evidence contemporaneous with the Bill of Rights of widespread recognition of a right to self-representation.

I do not participate in the Court's reliance on the historical evidence. To begin with, the historical evidence seems to me to be inconclusive in revealing the original understanding of the language of the Sixth Amendment. At the time the Amendment was first proposed, both the right to self-representation and the right to assistance of counsel in federal prosecutions were guaranteed by statute. The Sixth Amendment expressly constitutionalized the right to assistance of counsel but remained conspicuously silent on any right of self-representation. The Court believes that this silence of the Sixth Amendment as to the latter right is evidence of the Framers' belief that the right was so obvious and fundamental that it did not need to be included "in so many words" in order to be protected by the Amendment. I believe it is at least equally plausible to conclude that the Amendment's silence as to the right of self-representation indicates that the Framers simply did not have the subject in mind when they drafted the language.

The paucity of historical support for the Court's position becomes far more profound when one examines it against the background of two developments in the more recent history of criminal procedure. First, until the middle of the 19th century, the defendant in a criminal proceeding in this country was almost always disqualified

from testifying as a witness because of his "interest" in the outcome. See generally *Ferguson* v. *Georgia,* 365 U. S. 570 (1961). Thus, the ability to defend "in person" was frequently the defendant's only chance to present his side of the case to the judge or jury. See, *e. g.,* *Wilson* v. *State,* 50 Tenn. 232 (1871). Such Draconian rules of evidence, of course, are now a relic of the past because virtually every State has passed a statute abrogating the common-law rule of disqualification. See *Ferguson* v. *Georgia,* 365 U. S., at 575–577, 596. With the abolition of the common-law disqualification, the right to appear "in person" as well as by counsel lost most, if not all, of its original importance. See Grano, The Right to Counsel: Collateral Issues Affecting Due Process, 54 Minn. L. Rev. 1175, 1192–1194 (1970).

The second historical development is this Court's elaboration of the right to counsel. The road the Court has traveled from *Powell* v. *Alabama,* 287 U. S. 45 (1932), to *Argersinger* v. *Hamlin,* 407 U. S. 25 (1972), need not be recounted here. For our purposes, it is sufficient to recall that from start to finish the development of the right to counsel has been based on the premise that representation by counsel is essential to ensure a fair trial. The Court concedes this and acknowledges that "a strong argument can surely be made that the whole thrust of those decisions must inevitably lead to the conclusion that a State may constitutionally impose a lawyer upon even an unwilling defendant." *Ante,* at 833. Nevertheless, the Court concludes that self-representation must be allowed despite the obvious dangers of unjust convictions in order to protect the individual defendant's right of free choice. As I have already indicated, I cannot agree to such a drastic curtailment of the interest of the State in seeing that justice is done in a real and objective sense.

## III

In conclusion, I note briefly the procedural problems that, I suspect, today's decision will visit upon trial courts in the future. Although the Court indicates that a *pro se* defendant necessarily waives any claim he might otherwise make of ineffective assistance of counsel, *ante,* at 834–835, n. 46, the opinion leaves open a host of other procedural questions. Must every defendant be advised of his right to proceed *pro se?* If so, when must that notice be given? Since the right to assistance of counsel and the right to self-representation are mutually exclusive, how is the waiver of each right to be measured? If a defendant has elected to exercise his right to proceed *pro se,* does he still have a constitutional right to assistance of standby counsel? How soon in the criminal proceeding must a defendant decide between proceeding by counsel or *pro se?* Must he be allowed to switch in midtrial? May a violation of the right to self-representation ever be harmless error? Must the trial court treat the *pro se* defendant differently than it would professional counsel? I assume that many of these questions will be answered with finality in due course. Many of them, however, such as the standards of waiver and the treatment of the *pro se* defendant, will haunt the trial of every defendant who elects to exercise his right to self-representation. The procedural problems spawned by an absolute right to self-representation will far outweigh whatever tactical advantage the defendant may feel he has gained by electing to represent himself.

If there is any truth to the old proverb that "one who is his own lawyer has a fool for a client," the Court by its opinion today now bestows a *constitutional* right on one to make a fool of himself.