# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2998

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Martez Lamont Williams, | * | |
| | * | [UNPUBLISHED] |
| Appellant. | * | |

_____

Submitted: February 14, 2011
Filed: February 25, 2011

_____

Before RILEY, Chief Judge, WOLLMAN, and BYE, Circuit Judges.

_____

PER CURIAM.

Martez Lamont Williams appeals from the judgment entered by the district court[1] following Williams's conviction by a jury for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). In his counseled brief, Williams argues that the evidence was insufficient to support the verdict. In his pro se brief, Williams raises a number of issues, which are without merit or not properly raised on direct appeal. We affirm.

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

I.

At approximately 6:00 a.m. on October 4, 2008, a 911 operator received a call that shots had been fired at a boardinghouse in Minneapolis, Minnesota. Four Minneapolis police officers were dispatched to the boardinghouse, which has an unlocked outside door that leads to a locked security door. There is a vestibule between the outside door and the security door.

Officers Aimee Colegrove and Cheryl Goodman arrived first, exited their squad car, and ran to the front of the residence. Before they reached the door, they heard arguing and then the sound of two shots fired within the boardinghouse. In the meantime, officer Eric Faulconer and his partner arrived. Colegrove, Goodman, and Faulconer cautiously approached the boardinghouse. Faulconer observed a tall black male, wearing only boxer shorts and later identified as Williams, exit the front door and quickly re-enter the boardinghouse upon seeing the officers.

Although it was dark outside and there was no light in the vestibule, the officers could see movement between the outside door and the security door. Faulconer used his flashlight to illuminate the vestibule. He saw Williams moving within the vestibule, although he could not see what Williams was doing. Faulconer ordered Williams to throw any firearm out of the building. Williams opened the outside door and threw a revolver onto the ground. Faulconer, who was wearing gloves, picked up the revolver and placed it in his back pocket. With Colegrove's assistance, Faulconer handcuffed Williams and placed him in the squad car.

Faulconer later returned to the boardinghouse and entered the vestibule. The inner door had two large star bursts in the window pane, indicating that something had hit the glass. A resident opened the security door for the officers. Faulconer searched Williams's room and interviewed a witness who lived at the boardinghouse. The witness reported that he had heard four shots fired from the second floor and that

Williams had pounded on his door and yelled, "Don't kill me." The officers also interviewed other individuals who were in or near the boardinghouse at the time the shots were fired.

After he was sure the boardinghouse was secure, Faulconer examined the revolver and found two spent casings, indicating that two bullets had been fired from the gun. Faulconer did not touch the gun's hammer or trigger. He later gave the gun to officer Joseph Shepeck from the police department's crime lab team, who placed the revolver in a paper evidence bag. Shepeck also took into evidence a bullet that he found on the stairwell landing. While in custody, Williams provided a DNA sample, and the revolver's hammer and trigger were swabbed for DNA.

Following Williams's not guilty plea to the felon in possession charge, the case proceeded to trial. Williams stipulated that he had been convicted of a felony and that the firearm at issue had traveled in interstate commerce, leaving only the element of knowing possession to be established. After the first day of testimony, Williams dismissed his attorney and decided to represent himself, with his attorney advising him.

Officers Colegrove, Goodman, and Faulconer testified regarding the events that culminated in Williams's arrest. The forensic expert testified that he had analyzed the DNA from Williams and from the revolver. The profile revealed that the DNA from the revolver was consistent with being a mixture of DNA from two or more individuals and that the predominant DNA profile matched Williams. The expert stated that the predominant DNA would not be expected to occur more than once among unrelated individuals in the world population. When asked whether it is possible that an officer who physically touched the defendant and then handled the revolver could transfer the defendant's DNA onto the revolver, the expert responded that it was possible but that the defendant's DNA would not transfer to an area of the

gun that the officer did not touch. Another expert testified that the bullet found in the boardinghouse had been fired from the revolver that was recovered from Williams.

## II.

Williams contends that his conviction must be reversed because the government failed to prove that he knowingly possessed a firearm. We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the verdict and giving the verdict the benefit of all reasonable inferences. United States v. Butler, 594 F.3d 955, 964 (8th Cir. 2010). We do not weigh the evidence or assess the credibility of the witnesses, and we reverse only if no reasonable jury could have found the defendant guilty. Id. To convict Williams of being a felon in possession of a firearm, the government was required to prove beyond a reasonable doubt (1) that Williams previously had been convicted of a crime punishable by a term of imprisonment exceeding one year, (2) that he knowingly possessed a firearm, and (3) that the firearm had been in or affected interstate commerce. Id. The only element in dispute was whether Williams possessed a firearm.

Williams contends that a second person was with him in the vestibule, and thus the jury's verdict was speculative and not supported by sufficient evidence. Williams argues that the following evidence supports his theory of the case: that more than one person's DNA was found on the revolver, that the vestibule was dark, that the officers heard arguing as they approached the boardinghouse, and that residents heard arguing and Williams yelling, "Don't kill me." The jury heard the testimony and considered Williams's closing remarks that "two people could have been in that hallway, even three" and that they "[c]ould have locked me in that vestibule, ran into their apartments, hid themselves, ran out the b[ack] door." Based upon our earlier stated summary, we conclude that the evidence was clearly sufficient to support the jury's decision that Williams had knowingly possessed the firearm. (Indeed, Williams has

not challenged the sufficiency of the evidence on the knowledge element of the offense.)

## III.

Williams also has raised a number of issues in a pro se brief. We generally do not accept pro se briefs when an appellant is represented by counsel, see United States v. Donnell, 596 F.3d 913, 925-26 (8th Cir. 2010), but in light of the fact Williams represented himself at trial, we will consider those arguments that have been properly raised on direct appeal. We will not address his claim of ineffective assistance of counsel "because such claims usually involve facts outside of the existing record and are therefore best addressed in postconviction proceedings under 28 U.S.C. § 2255." United States v. Jones, 586 F.3d 573, 576 (8th Cir. 2009).

Williams contends that the prosecutor violated his Fifth Amendment right to due process by using false and perjured testimony to secure his conviction. Williams, however, has failed to show that the prosecution used false or perjured testimony. See United States v. West, 612 F.3d 993, 996 (8th Cir. 2010) ("To prove use of false testimony, [the defendant] must show that (1) the prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict." (internal quotations and citation omitted)). Williams contends that officer Goodman committed perjury when she testified that she observed Williams throw the gun out the door. Goodman, however, testified repeatedly that she did not see Williams throw the gun. She testified that she saw the gun come out of the door and hit the ground, but that she did not see Williams. Williams also argues that a grand jury witness perjured herself, but he has failed to provide any evidence to support this contention. Accordingly, Williams's due process violation claim fails.

Williams also argues that he was forced to represent himself, in violation of his Sixth Amendment right to counsel. The district court, however, conducted a lengthy colloquy to establish whether Williams knowingly, voluntarily, and intelligently waived his right to counsel. See Faretta v. California, 422 U.S. 806, 835 (1975) ("[I]n order to represent himself, the accused must knowingly and intelligently forgo [the right to counsel.]" (internal quotations and citations omitted)). During the colloquy, Williams stated that he understood that he had a right to counsel but wished to represent himself. The district court informed Williams of the dangers of self-representation and the limited role his advisory counsel would serve. The district court tested Williams's understanding of the charges against him and of the sentence he would face if convicted. The district court further explained that Williams would be required to follow the same rules as an attorney, to which Williams responded by stating that he was familiar with the Federal Rules of Evidence and the Federal Rules of Criminal Procedure. When asked whether he understood that he could not argue on appeal that he "didn't get a fair trial because [he] was forced to represent [him]self," Williams responded, "I understand that perfectly." Our review of the record satisfies us that Williams knowingly, voluntarily, and intelligently waived his right to counsel and that the district court did not err in allowing him to proceed pro se.

IV.

The conviction is affirmed.[2]

_____

_____

[2]We deny Williams's pro se motion for permission to submit a supplemental brief.