# United States Court of Appeals
## For the Eighth Circuit
_____

No. 24-1102
_____

United States of America

*Plaintiff - Appellee*

v.

David Michael Woods

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern
_____

Submitted: March 19, 2025
Filed: May 23, 2025
_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.
_____

BENTON, Circuit Judge.

A jury convicted David Michael Woods of four counts of production, distribution, and possession of child pornography in violation of 18 U.S.C. §§ 2251(a), 2251(e), 2252(a)(2), 2252(a)(4)(B), 2252(b)(1), and 2252(b)(2). The

district court[1] sentenced him to consecutive sentences of 360 months on two counts and 240 months on the others, totaling 1,200 months in prison. He appeals his conviction and sentence. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

Woods was charged with sexually abusing his 12-year-old foster son and his 15-year-old adopted son. The district court summarized the "horrific" facts at sentencing:

> Over multiple years, the defendant located and took in foster children whom he then sexually abused, encouraged others to sexually abuse, and used to create child pornography that he then distributed to other pedophiles.
>
> There is evidence that the defendant deliberately sought out vulnerable boys within his preferred age range for this purpose, and there's every bit of evidence in his messages that he delighted in grooming and sexually abusing them.
>
> Many of the events that underlie this case took place when these boys were trapped alone with the defendant in his home during COVID's isolation period, when the defendant was working from home, when these boys weren't in school. The defendant was the only adult that lived in this home, and so these boys were trapped with a violent pedophile who was loaning them out to other violent pedophiles and filming and photographing their violation.
>
> What Defendant did to these boys is absolutely heartbreaking. It's evil. There's no other word for it. Rather than protecting boys who had already been abused and traumatized by their birth circumstances and were in foster care because of that, Defendant sought out victims that he obviously believed would not be trusted if they reported the abuse.

---

[1]The Honorable Stephanie M. Rose, Chief Judge, United States District Court for the Southern District of Iowa.

. . . .

He secured these boys in his home alone. Certainly there's evidence from the videos and photos that he had them remain unclothed for significant portions of the day so they were easier to abuse, easier to photograph. You know, the defendant exchanging text messages cheerfully, delightfully with violent pedophiles about these boys, it was sickening. It is sickening. That the defendant gained pleasure himself from watching these violent pedophiles rape and abuse these boys is just almost unimaginable.

A grand jury charged Woods with production, distribution, and possession of child pornography. Woods retained an attorney but later moved to represent himself. After a *Faretta* hearing, the court granted his motion to represent himself. It appointed standby counsel. The jury convicted him on all counts.

I.

Woods argues he did not validly waive his right to counsel. He asserts that "the *Faretta* hearing conducted at the trial court was insufficient to ensure" that his "waiver of his right to appointed counsel was knowing, voluntary, and intelligent." Woods did not object to the court's decision to allow him to represent himself at trial. The parties disagree about the standard of review—de novo or plain error. *See* **United States v. Luscombe**, 950 F.3d 1021, 1027 (8th Cir. 2020) (recognizing that "it is unclear whether a defendant must formally object to the district court's decision to continue to allow him to represent himself at trial . . . in order to preserve these issues for our review"). But this court need not decide the issue because Woods's claim fails under either standard. *Id*. (declining to decide whether to review for plain error because the court could affirm under the "ordinary" standard).

The Sixth Amendment's right to counsel "necessarily implies the right of self-representation." **Faretta v. California**, 422 U.S. 806, 832 (1975). Through self-representation, the defendant "relinquishes . . . many of the traditional benefits associated with the right to counsel." *Id*. at 835. "For this reason, in order to

represent himself, the accused must knowingly and intelligently forgo those relinquished benefits." *Id*. (internal quotation marks omitted). "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id*., *quoting **Adams v. U.S. ex rel. McCann***, 317 U.S. 269, 279 (1942).

The *Faretta* inquiry need not follow any "prescribed . . . formula or script." ***Iowa v. Tovar***, 541 U.S. 77, 88 (2004). *See **United States v. Turner***, 644 F.3d 713, 722 (8th Cir. 2011) ("[N]either the Supreme Court nor this court has ever adopted a list of essential points that must be conveyed to a defendant in order for a waiver of counsel to be deemed knowing and voluntary."). "The adequacy of the waiver depends on the particular facts and circumstances of each case, including the background, experience, and conduct of the accused." ***Turner***, 644 F.3d at 721.

The district court[2] engaged Woods in a lengthy and detailed discussion about self-representation at the *Faretta* hearing:

> THE COURT: You've indicated you want to represent yourself. I must impress upon you that this is not considered a good idea because there are many dangers and disadvantages in self-representation. I'm advising you that the use of counsel is a much better alternative than self-representation dealing with the charges against you. So I want to remind you and advise you that if you cannot afford counsel, one will be appointed for you.
>
> An attorney knows how to prepare a case for trial. Mr. Woods, have you ever done this before?
>
> DEFENDANT WOODS: Never.

---

[2]The Honorable Stephen B. Jackson, Jr., United States Magistrate Judge for the Southern District of Iowa.

THE COURT: Despite thorough preparation, unexpected events may arise that require an instant response for that—a Defendant's rights. An experienced attorney, as Mr. McAtee certainly is, has seen many of these situations before in his or her career. This will all be new to you.

There are subtle distinctions between making persuasive arguments to a judge and to a jury. An experienced attorney will be familiar with those distinctions. An experienced attorney will know how to select a jury. An experienced attorney will know how to write jury instructions that will be given to the jury before they deliberate on your case. An experienced attorney will know how to preserve issues if your case is appealed to a higher court.

More importantly, an experienced attorney will be able to plan strategies and tactics in your case objectively. An attorney will not be too close to the case and, therefore, his or her emotions will not get in the way of defending your case effectively.

In light of this discussion and my comments, do you still wish to represent yourself?

DEFENDANT WOODS: Yes, sir.

THE COURT: Since you've again indicated you choose to represent yourself, I'm going to ask you several questions to determine whether you fully understand your choice, that you fully know what you're doing, and that you've made your choice with your eyes fully open to all the dangers and disadvantages that attach to self-representation. Do you understand?

DEFENDANT WOODS: Yes, sir.

THE COURT: So, Mr. Woods, you need to understand that if you— and realize that if you represent yourself, you are on your own. Do you understand that?

DEFENDANT WOODS: Yes, sir.

THE COURT: The Courts, either myself or Judge Rose, or any other judge in your case cannot tell you how to try your case, advise you as

to how to try your case, or help you in any way. Do you understand that?

DEFENDANT WOODS: Yes, sir.

The court then asked Woods a variety of other questions about his self-representation.

Woods alleges several insufficiencies with the *Faretta* inquiry. He complains that he did not have copies of the court rules and that he "struggled with basic evidentiary rules." But he admitted at the hearing that "I don't have a copy of the rules." And he still chose to waive his right to counsel. The court also emphasized that Woods was not familiar with the law of the case or the rules of evidence or criminal procedure. And the court made clear that it would be better for Woods to be represented by counsel:

> I need to advise you that in my opinion you'd be better off being defended by a trained lawyer than you would be by defending yourself. I think it's unwise of you to try to represent yourself. You're not familiar with the law governing the case—this case, the rules of evidence, or the Rules of Criminal Procedure, and so I strongly urge you not to try to represent yourself, Mr. Woods.

Woods did not need to "have the skill and experience of a lawyer in order competently and intelligently to choose self-representation" because the court made him "aware of the dangers and disadvantages of self-representation." *Faretta*, 422 U.S. at 835.

Woods claims he faced an "unknown limitation" on discovery because the court did not tell him he could not have copies of discovery in jail until "*after* he had been granted the ability to proceed pro se." Yet "*after*" in this case was immediately following the court's grant of Woods's motion to self-represent. The court's discovery discussion sufficiently warned Woods that "there are certain parts of discovery that by statute and otherwise the Government is not allowed to have it

leave their possession.  It can be viewed at their office but cannot otherwise leave their possession.  And so that will make it difficult or impossible for you to see some of that discovery."  The discussion of discovery limitations *immediately after* the court granted Woods's request to self-represent gave him ample opportunity to change his mind and request counsel.

Woods maintains "the court also failed to advise" him "about the limits of standby counsel."  This is not so.  The court explained the purpose of standby counsel to aid him or represent him if his right to self-representation was terminated.  Regardless, a defendant who elects to represent himself "does not enjoy an absolute right to standby counsel."  ***United States v. Webster***, 84 F.3d 1056, 1063 (8th Cir. 1996).  And because he had no "absolute right to standby counsel," any alleged failure of the adequacy of advice on this issue does not "negate the validity" of his "waiver of his right to counsel."  ***United States v. Keiser***, 578 F.3d 897, 904 (8th Cir. 2009).

Woods believes the court "did not adequately explain the statutory maximum sentence" he faced.  The court thoroughly advised him of the penalties for each charge, including the minimum and maximum terms of imprisonment for each count.  It then explained the possibility of consecutive sentences:

> THE COURT: And so I—you're charged in more than one count and so if you're convicted of more than one count the judge has certain sentencing options.  The judge can order—and for you this is Chief Judge Stephanie Rose.  Judge Rose can order your sentences to run concurrently or consecutively.  Do you know the difference between those types of sentences, Mr. Woods?
>
> DEFENDANT WOODS: Yes, sir.
>
> THE COURT: So you know consecutive sentences run one after the other and if you're convicted on all of these four counts, you have a mandatory minimum of 15 years on Count 1, 15 years on Count 2, and five years on Count 3.  So you could face a minimum of 35 years in

prison if those counts are run consecutive to each other. Do you understand that?

DEFENDANT WOODS: Yes, sir.

Woods argues that in addition to calculating the minimum consecutive sentences, the court was required to explain that the maximum sentences would total 100 years if imposed consecutively. But this is not required. *See **United States v. Burney***, 75 F.3d 442, 445 (8th Cir. 1996) (holding that the "district court fulfilled its Rule 11(c) obligations by explicitly informing Burney twice that the maximum term of imprisonment for *each* of the three counts was ten years" and stating that "Rule 11 does not require the sentencing court to inform the defendant of the applicable guideline range or the actual sentence he will receive").

The court's *Faretta* inquiry was more than sufficient to show a knowing and intelligent relinquishment of benefits. The record shows Woods understood the dangers and disadvantages of self-representation, including the maximum punishment he faced, standby counsel's limited role, and the limitations on discovery. Woods chose self-representation "with eyes open." *Faretta*, 422 U.S. at 835. The district court did not err—plainly or otherwise—by accepting Woods's waiver of counsel.

II.

Woods challenges the district court's instruction on reasonable doubt. "Where a party fails to timely object to an instruction at trial," this court reviews for plain error. *United States v. Poitra*, 648 F.3d 884, 887 (8th Cir. 2011). Under plain error review, "the party seeking relief must show that there was an error, the error is clear or obvious under current law, the error affected the party's substantial rights, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*.

The district court adequately instructed the jury on the reasonable doubt standard. Both at the beginning of trial and before closing arguments, it read the Eighth Circuit's model instruction defining reasonable doubt. In his closing, Woods stated that the government "failed to prove their case by near certainty." The government objected. The court responded, "the Government does not have to prove by a near certainty. The burden is proof beyond a reasonable doubt, as you've been instructed." This response was not plainly erroneous. Woods agreed to the model instruction on reasonable doubt, and the court merely redirected the jury to that definition.

III.

Woods believes the district court's statement "that the court believed he would commit perjury if he testified . . . infringed on his constitutional right to testify on his own behalf." Woods concedes he did not object at trial, so review is for plain error. *See **id***.

After the government's case, the district court made "a record" about Woods's "right to testify or right not to testify." It said:

> You have, obviously, a constitutional right to remain silent. If you choose to not testify in this case, I will tell the jury that they can't hold that against you in any way. In fact, I will tell them they can't even discuss it when they go back to the jury room to conduct their deliberations.
>
> If you do choose to testify, obviously, you may open some doors that have otherwise been closed as far as what Ms. Glasgow may be able to get into. If you testify falsely or commit perjury, the Government could charge you with additional charges. In the event you were convicted, if I found that you had attempted to obstruct justice during your testimony, I could enhance your sentence for that.
>
> Obviously, my expectation is that you wouldn't testify falsely, but given the nature and extent of the evidence in this case, I have some

real concerns about you exposing yourself to additional charges or additional enhancements if you do choose to take the stand.

We want you to consult with an attorney about these matters and to help—listen to his advice, but, obviously, this is your decision and your decision alone to make.

Do you understand those matters?

MR. WOODS: Yes, Your Honor.

THE COURT: Okay. Why don't you and Mr. McAtee visit for 15 minutes or so, and then we'll get a decision from you regarding whether you anticipate you will or won't testify in this case.

Woods thinks the court's "admonitions and inquiry went a step too far" by saying it had "real concerns" about him exposing himself to additional penalties. Woods relies on *United States v. True*. *See **United States v. True***, 179 F.3d 1087 (8th Cir. 1999). There, the court found improper the government's statement that "she could and would" bring perjury charges because it was "an impermissible, coercive threat designed to prevent him from testifying." *Id*. at 1090. Woods also invokes *Webb v. Texas*. *See **Webb v. Texas***, 409 U.S. 95 (1972). There, the court found error in a trial court's statements to a potential defense witness that if "you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury" and the likelihood "is that you would get convicted of perjury and that it would be stacked onto what you have already got." *Id.* at 95–97.

The court's statements here are distinguishable from *True* and *Webb*. First, unlike *True*, the district court's admonition was not threatening or intimidating. Rather than threatening that Woods "probably would" or "will be" charged with perjury, the district court here only warned that false testimony "could" lead to a perjury charge. *See **True***, 179 at 1090. Second, unlike *Webb*, the court did not imply that it expected the defendant to lie. *See **Webb***, 409 U.S. at 95–97. To the contrary, the court explicitly stated its "expectation . . . that you wouldn't testify falsely."

-10-

Finally, the court made clear that Woods retained the sole discretion to decide whether to testify and encouraged him to speak with standby counsel about his decision, giving him time to do so. Nothing suggests the court's statements caused Woods not to testify. In fact, before the court's admonition, Woods equivocated about whether he wanted to testify:

> THE COURT: Are you still planning to testify?
>
> MR. WOODS: I wouldn't—I would need to think about that again.
>
> THE COURT: Well, now's the time to think about it because it's going to happen this morning—
>
> MR. WOODS: I'm trying.
>
> THE COURT: —if it's going to happen.
>
> MR. WOODS: Is it okay if we confer with our witnesses?
>
> THE COURT: You can talk to [your sister.]
>
> MR. WOODS: Okay.

The "Sixth Amendment is not implicated every time a prosecutor or trial court offers advice regarding the penalties of perjury." *United States v. Davis*, 974 F.2d 182, 187 (D.C. Cir. 1992). "Indeed, there are circumstances when warnings about the possibility and consequences of a perjury charge are warranted—even prudent." *Id*. The inquiry "in determining the coercive impact of perjury warnings" is "extremely fact specific," including "the manner in which the prosecutor or judge raises the issue, the language of the warnings, and the prosecutor's or judge's basis in the record for believing the witness might lie." *True*, 179 F.3d at 1090. None of these factors suggests an improper admonition here. The court did not plainly err in warning Woods about the danger of testifying falsely.

Similarly, Woods asserts that the "district court's warning that it believed a potential witness would commit perjury violated Mr. Woods's right to present a defense." Again, Woods concedes he did not object at trial, so review is for plain error. *See Poitra*, 648 F.3d at 887.

When Minor Victim 2's attorney arrived on the second day of trial, the court gave her a summary of the evidence and shared Woods's intent to call her client as a witness:

> THE COURT: Ms. Araguas, the defendant has identified who we've referred to as Minor Victim 2 as a potential witness in this case. This jury has seen substantial evidence of [Minor Victim 2] in videos and images that the jury may well find to be child pornography and has heard testimony that he was habitually abused by the defendant for a number of years, either prior to or after his adoption.
>
> The defendant would like to call him to ask him where they were on a particular day at a particular time. There's already been some video evidence of the defendant's presence—not [Minor Victim 2]'s presence, but the defendant's presence on the particular occasion in the form of a videotape that he wants to ask Mr.—or ask [Minor Victim 2] about.
>
> That raises some concerns that [Minor Victim 2] may be put in a position of being asked to commit perjury on behalf of this defendant, and, given his youth and all of the surrounding entanglements here, we thought it was best if he had an attorney to consult.
>
> Have you had an opportunity to consult with [Minor Victim 2]?
>
> MS. ARAGUAS: Your Honor, I have met with him briefly yesterday by phone. I was actually just sneaking in here to talk to Mr. McAtee and potentially Mr. Woods briefly and then would meet with [Minor Victim 2] in person. I just got to Davenport 15 minutes ago.

THE COURT: Okay. We'll let you go ahead and meet with him and then make a decision about whether or not he would like to testify in this case. I think he probably has a Fifth Amendment privilege not to testify as the defendant has proposed, given the videos that we've seen. I also think if he takes the stand, Ms. Glasgow could fairly cross-examine him on a whole lot of stuff that would be pretty difficult for him, and so those are my concerns. So I'll let you visit with him, and then we'll talk more.

As Woods concedes, "the district court has the discretion to warn a witness about the possibility of incriminating himself." Again, this court considers "the manner in which the prosecutor or judge raises the issue, the language of the warnings, and the prosecutor's or judge's basis in the record for believing the witness might lie." *True*, 179 F.3d at 1090. Applying these factors, Woods fails to establish plain error.

First, filtering the warning through counsel softened the impact of the court's warning. Without a direct admonition from the court to Minor Victim 2, there was no "great disparity between the posture of the presiding judge and that of a witness." *Webb*, 409 U.S. at 98.

Second, the district court's wording is dissimilar to the cases Woods cites. *See, e.g.*, *id.* at 96 (the trial judge singled out the defense witness with a threat to "personally see that your case goes to the grand jury and you will be indicted for perjury," which would add years "stacked onto what you already got" and "will also be held against you in the penitentiary when you're up for parole"); *United States v. Arthur*, 949 F.2d 211, 214-15, 216 (6th Cir. 1991) (the trial court "repeatedly informed [the witness] of his right to remain silent and stated to him that to testify was against his interest," even though the witness was represented by counsel who had already advised him not to testify). Unlike these cases, the district court did not make repeated threats of imprisonment or claims that testifying was against the witness's interest. Rather, it gave Minor Victim 2's attorney background information and identified general concerns that allowed Minor Victim 2 to receive informed legal advice.

-13-

Third, the district court held well-founded concerns about Woods suborning perjury. Woods said he wanted to ask Minor Victim 2 about their whereabouts on a date in question. This questioning resembles testimony Woods later elicited from his sister, who claimed that she, Woods, their parents, and "the kids" spent that date at the riverfront (not being sexually abused, as was alleged). The jury's guilty verdict reflects that it disbelieved his sister's testimony. And a jail phone call between Woods and his sister after trial confirmed this:

Michelle Woods: Are you okay?

David Woods: I mean, as okay as I can be. It's just—it's different—it's not how I imagined it working out either. So—

Michelle Woods: But you did bad things.

David Woods: I just—

Michelle Woods: And had me lie for you. And I found out right before I walked on the stage, as I was walking into the courtroom, following the guy walking me in, that's when I saw [Minor Victim 2] in another room crying by himself. The lawyer had just walked out of the room and I stopped and I went in and said, why are you crying? And he told me right then as I was walking into the courtroom.

David Woods: I'm so sorry.

Finally, Woods makes no showing that the warning caused Minor Victim 2 not to testify. There was no plain error in the court's statements. *See True*, 179 F.3d at 1090 (finding no prejudice when "the record does not support the conclusion that the prosecutor's comments caused [the witness's] silence").

V.

Woods believes that even if one of these errors alone does not warrant reversal, "the errors combined require reversal for a new trial under the cumulative

-14-

error doctrine." This court "may reverse on the basis of cumulative error only where the case as a whole presents an image of unfairness resulting in the deprivation of the defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." *United States v. Anderson*, 783 F.3d 727, 751 (8th Cir. 2015). Because this court has rejected all of Woods's "claimed errors, his cumulative-error argument fails." *Id*.

## VI.

Woods argues the district court erred in imposing a $2,500 assessment because he does not have the ability to pay. Woods did not object at sentencing, so review is for plain error. *See Poitra*, 648 F.3d at 887.

Under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA), "the court shall assess . . . not more than $50,000 on any person convicted of a child pornography production offense." **18 U.S.C. § 2259A(a)(3)**. Money collected under the AVAA funds the "Child Pornography Victims Reserve," which provides assistance to exploited child victims. *Id*. **§ 2259B**. Imposing the special assessment, the court shall consider, among other things, "the defendant's income, earning capacity, and financial resources." *Id*. **§§ 2259A(c), 3572(a)(1).**

At sentencing, the district court asked if Woods had any thoughts on the special assessment under the AVAA. He said, "I understand that I would be getting a job when I go to jail. I don't know how much it is or—from my understanding, I would work it out with the probation office or the prison itself on how much they take out." The court imposed a $2,500 assessment.

Woods bears the burden to prove his inability to pay. *See United States v. Wesley*, 96 F.4th 1045, 1047 (8th Cir. 2024) (defendant bears the burden to prove indigency under the Justice for Victims Trafficking Act (JVTA)); *United States v. Ball*, 2024 WL 3311412, at *1 (8th Cir. July 5, 2024) (unpublished) (defendant "bears the burden of proving his indigence" in a case involving both AVAA and

JVTA assessments).  "[I]ndigency depends on a defendant's current financial situation *and* his ability to pay in the future." *Wesley*, 96 F.4th at 1047 (internal quotation marks omitted).

Supporting his current financial situation, Woods points to his court-appointed attorney on appeal and his negative net worth.  But these are not dispositive.  "An individual may be indigent for purposes of appointing counsel and, at the same time, may be non-indigent for purposes" of a special assessment. *United States v. Rhodes*, 828 Fed. Appx. 342, 343 (8th Cir. 2020).  And his slight negative net worth of $1,854 does not automatically make him indigent. *See United States v. Kelley*, 861 F.3d 790, 796 (8th Cir. 2017) (finding no indigency where the defendant had an approximate negative net worth of under $100).

On his ability to pay in the future, the district court said, "he would have probably a good 25 years of serving time in a prison that he could earn some money towards an assessment."  Woods complains that "inmates earn between 12 cents and 40 cents per hour at their work assignments."  But this court has upheld larger assessments based on the finding that a defendant can earn money in prison. *See Ball*, 2024 WL 3311412, at *2 (upholding a $5,000 assessment under the AVAA and a $15,000 assessment under the JVTA, noting that even weekly prison wages "between $4.80 and $16" can "make a sizable dent in his financial obligations"); *United States v. Wright*, 540 F.3d 833, 847 (8th Cir. 2008) (holding that in "light of the fact that he's sentenced to a life sentence and he'll be eligible for UNICOR and other prison programs, I believe that he does have the ability to pay a fine" of $25,000).

The district court did not clearly err in its special assessment under the AVAA.

\* \* \* \* \* \* \*

The judgment is affirmed.

_____

-16-