# United States Court of Appeals
## For the Eighth Circuit
_____

No. 24-3462
_____

United States of America

*Plaintiff - Appellee*

v.

Harold Bennie Kaeding

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 21, 2025
Filed: March 27, 2025
_____

Before SMITH, KELLY, and GRASZ, Circuit Judges.
_____

SMITH, Circuit Judge.

Harold Kaeding appeals his conviction and 87-month sentence arising from his COVID-19 related loan fraud. Kaeding challenges the district court's[1] denial of his motion to suppress, the waiver of his right to counsel, whether he received a fair trial, and a sentencing enhancement for obstruction of justice. We affirm.

_____

[1]The Honorable Eric C. Tostrud, United States District Judge for the District of Minnesota.

I. *Background*

A. *Pre-Detention*

In response to COVID-19, Congress passed the Coronavirus Aid, Relief, and Economic Safety Act, which included a Paycheck Protection Program (PPP) administered by the Small Business Administration (SBA). The PPP allowed businesses to borrow funds from banks for use with short-term payroll obligations. In addition, the SBA would repay the loans for the business. Loan terms required the borrowers to make multiple sworn representations about themselves and their businesses under the penalty of perjury. Similarly, the SBA provided and repaid Economic Injury Disaster Loans (EIDL) connected to COVID-19.

Between March and June 2020, Kaeding, along with his wife and son, applied for eight PPP loans and four EIDL. Kaeding provided false information for companies that were inactive or otherwise did not comply with the loan requirements. He supported the applications with forged tax and bank documents. Based on these misleading submissions, lenders approved and provided $504,090 in PPP funds. Lenders disapproved or rejected five additional PPP loan applications, totaling $1,362,435. Similarly, Kaeding submitted four EIDL applications with similar false information. Only one company seeking an EIDL generated revenue, but less than claimed in the application. Banks provided an additional $154,400 to Kaeding based on EIDL applications.

The scheme unraveled when a lender reviewing one of Kaeding's PPP applications suspected that it contained false information and notified law enforcement. Law enforcement then reviewed the applications and noticed that all the applications originated from Kaeding's address, despite listing separate applicants. Those applicants included Kaeding, his wife, and his son.

On January 13, 2021, around 6:00 a.m., a team of approximately 17 law enforcement officers conducted a warrant-authorized search of Kaeding's residence. Law enforcement arrived at the residence, knocked on the door, and displayed their credentials. Kaeding's wife refused to open the door and retreated into the house.

The officers' concern for their safety and potential evidence destruction heightened. The officers then forced the door open and entered with their guns drawn while securing the house.

As the home search proceeded, two FBI personnel—a special agent and a forensic accountant—asked Kaeding to speak with them. After Kaeding put his hearing aids in, the officers informed him that he was not under arrest and that he was free to leave. The agent, however, added the caveat "unless we discover some other crime that's already occurred." R. Doc. 123, at 48. The officers told Kaeding that he did not have to talk, but that if he did answer a question, he must speak truthfully or risk criminal charges. *See* 18 U.S.C. § 1001. Kaeding signed a form confirming his awareness of the consequences of false statements to officers.

Kaeding ultimately spoke with the agents. He answered some questions but declined to answer others. Kaeding was not handcuffed or otherwise physically restrained, and the FBI personnels' firearms remained holstered. At the end of the interview, Kaeding took some medicine, went to his recliner, asked for and received a pillow and blanket, and fell asleep. At no point was Kaeding placed under arrest or restricted in his movement around the house. During the search, the officers reviewed bank account statements. The statements revealed proceeds from the fraud scheme.

After the house search, Kaeding obtained legal counsel, began plea negotiations with the government, and submitted a proffer. The proffer stated that Kaeding was responsible for the loan application submissions, that the submissions included false information, and that neither his son nor wife were aware of the applications submitted in their names. The proffer, however, did not lead to a plea agreement.

In April 2021, days after rejecting a plea offer, Kaeding flew to Colombia alone. Law enforcement, Kaeding's prior defense counsel, and Kaeding's family urged Kaeding to return to the United States voluntarily. He did not. Law

enforcement obtained Colombian assistance to find, apprehend, and eventually extradite Kaeding.

Colombian immigration officials eventually located and visited Kaeding in November 2021. During this visit, Kaeding agreed to meet them at the immigration office, but he failed to appear. He was later apprehended and returned to the United States after a contested extradition. Due to his Colombian abscondment, the magistrate judge ordered Kaeding detained pending further proceedings.

In March 2022, while Kaeding was in custody, the grand jury subpoenaed his daughter to produce items such as documents and devices that she held for her father. The government took possession of, but did not examine, the electronic devices and agreed not to do so without a search warrant.

B. *Motions Practice and Pretrial Hearings*

Shortly after his first appearance in Minnesota, Kaeding filed multiple motions. Through counsel, Lee Johnson and Karen Mohrlant, Kaeding requested and was granted five continuances to file pretrial motions and hold a pretrial motion hearing. Then, on October 3, 2022, Kaeding sent a letter to the district court and the government, stating, "I am firing Lee Johnson as my attorney effective October 6, 2023. At this time it is not my intension [sic] or am I ready to proceed with this trial." R. Doc. 62, at 1. At the motions hearing, Kaeding's second counsel, Mohrlant, explained that Kaeding wanted his letter to be construed as a motion to substitute counsel. On October 14, 2022, Kaeding, through Mohrlant, filed pretrial motions, including three motions to suppress. Relevant to this appeal, Kaeding requested to suppress his statements made during the interview at his house during the execution of the search warrant. The motion alleged that law enforcement violated his Fourth Amendment rights by not reading him his *Miranda*[2] rights before questioning him in custody.

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

On November 4, 2022, Kaeding's counsel filed a motion for reconsideration of detention due to medical concerns. On February 28, 2023, the magistrate judge denied this request but ordered his transfer from an out-of-state facility to the Federal Medical Center in Rochester, Minnesota.

On April 28, 2023, the court held a hearing, which among other things, addressed the status of Kaeding's representation. The magistrate judge declined to replace Johnson as one of Kaeding's attorneys. Over the next few months Kaeding continued to express displeasure with Johnson's representation.

The magistrate judge recommended that the district court deny the motions to suppress based on its conclusion that Kaeding was not in custody when interviewed in his home. Consequently, no *Miranda* warning was required and thus the questioning did not violate Kaeding's constitutional rights. It further found that Kaeding made voluntary statements to the interviewers. It then found that the search warrant was not based on stale information. The magistrate judge also declined to suppress the property seized from Kaeding's daughter's possession. The district court accepted the magistrate judge's report and recommendation and denied the three motions to suppress.

C. *Motions to Withdraw and* Faretta[3] *Hearings*

The pretrial process took a consequential turn on August 2, 2023. On that date, Kaeding directed his counsel to file a motion to withdraw and allow Kaeding to represent himself. The magistrate judge held a *Faretta* hearing on August 14, 2023. At the hearing, Mohrlant explained that Kaeding wanted hybrid counsel that would enable him to file his own pleadings with standby counsel following his directions. Mohrlant found this type of arrangement "fraught with danger." R. Doc. 156, at 6.

The magistrate judge addressed Kaeding's understanding of standby counsel's role and thoroughly outlined the pitfalls of self-representation:

---

[3]*Faretta v. California*, 422 U.S. 806 (1975).

If you are going to represent yourself, you are going to represent yourself, and that means that you will do your own research, your own writing, make your own strategic decisions, and question witnesses and make arguments to the Court and to the jury.

Standby counsel would be in the courtroom and would be available for consultation, but you are not—you are describing a situation that looks like a client who wants to have more control than they have right now, and that's understandable but that's also a matter to be discussed with your lawyers and not—I mean, I don't see you actually asking to represent yourself as the way I understand, at least, self-representation.

*Id.* at 14–15. Kaeding responded:

I definitely want to represent myself. I have been working with these lawyers for the past year and a half and we're not making any progress. So, like I say, I have a very, very thorough understanding of what the issues are so I can work through the other difficulties. But, yes, I definitely want to represent myself.

*Id.* at 15. Further discussion within the *Faretta* hearing subsequently continued:

THE COURT: All right. Mr. Kaeding, I will be expecting you to write whatever is submitted by the defense to the Court. Certainly Ms. —I will order, you know, if the motion is granted, part of it would be directing Ms. Mohrlant, Mr. Johnson to do supporting legal research, but you would have to provide them with the framework that they could then do the research on. I would not want standby counsel to be asking questions of witnesses at trial. That's on you.

With those expectations, Mr. Kaeding, do you still wish to represent yourself?

THE DEFENDANT: Yes.

THE COURT: Mr. Kaeding, I must tell you I think this is a terrible idea. I think that a trained lawyer, trained and experienced lawyer, will do a far better job of defending this case than you can do

yourself. I think it is unwise of you to try to represent yourself. You are not familiar with the law. You are not familiar with the rules. You are not familiar with court procedure. You have never tried a case before. I strongly urge you to reconsider this idea.

.   .   .

THE COURT: So, Mr. Kaeding, having heard everything that's been discussed here today, and in light of the serious penalties that you might suffer if you are found guilty of even some of the alleged crimes in the Superseding Indictment, and in light of all the difficulties of representing yourself, do you still want to give up your constitutional right to be represented by a lawyer and to go forward representing yourself?

THE DEFENDANT: One factor I guess I would like the Court to be aware of is that any sentence is likely to be a life sentence for me. So I can say that the issue is the sentencing isn't such a big concern because, like I say, any sentence would probably be a life sentence. But, yes, I still want to represent myself.

THE COURT: Has anyone threatened you to make you give up your right to counsel? I want to make sure this is voluntary.

THE DEFENDANT: I don't understand the question.

.   .   .

THE COURT: All right. Let me ask the question again. Has anyone threatened you or made promises to you to get you to give up your right to counsel?

THE DEFENDANT: No.

THE COURT: Is there any reason I ought to be concerned about your ability to make an important decision like this one?

THE DEFENDANT: No.

THE COURT: Is your decision entirely voluntary?

THE DEFENDANT: Yes.

THE COURT: All right. All right, Mr. Kaeding, I find that you have knowingly and voluntarily waived your constitutional right to be represented by a lawyer. I will permit you to represent yourself. I will appoint Ms. Mohrlant as standby counsel. Ms. Mohrlant will accept drafts of things that you are wanting to file with the Court. She is not obligated to give legal input on whether these filings are wise or unwise, but she will do research in order that the points you are making are supported by the law, if in fact they are. Ms. Mohrlant, however, will not sign these pleadings and will not be responsible for their content.

*Id.* at 21–26. After indicating it would grant the motion for self-representation, the court directed that court-appointed counsel remain on stand-by and assist with certain ministerial tasks, including filing documents and performing requested legal research.

Kaeding then filed a motion to reconsider his pretrial detention, seek accommodations for trial, and obtain internet access for filing and serving documents. The magistrate judge rejected the request for an indefinite stay of the proceedings. With respect to internet access, the magistrate judge specifically held that "access to a computer with specific applications for several hours a day is not required for Mr. Kaeding to prepare for trial. Mr. Kaeding may review trial materials without a computer." R. Doc. 175, at 23.

In response to the order, the government recopied all disclosures under Federal Rule of Civil Procedure 16 that it previously provided to defense counsel and had those materials delivered to Kaeding on February 9, 2024.

On March 8, 2024, the district court held a pretrial hearing and further inquired of Kaeding under *Faretta*:

Q. Okay. Do you understand, Mr. Kaeding, that you have the right to be represented by an attorney in this case, either a lawyer who you hire

or, if you cannot afford to hire a lawyer, then by one appointed to represent you at no cost to you?

Do you understand that?

A. Yes.

Q. And in this case do you understand that Judge Docherty, had you not made this decision, has appointed two lawyers to represent you at no cost to you?

Do you understand that?

A. Yes.

Q. Okay. Let me sort of walk through a series of questions that I think implicate or try to demonstrate, Mr. Kaeding, to you the challenges that a pro se defendant in a criminal case faces.

The law can be difficult. You know, several sets of rules govern a criminal trial. There are Rules of Criminal Procedure, there are Rules of Evidence, and statutes and so forth. Attorneys are trained and have experience in these areas.

Do you understand that?

A. Yes.

Q. Okay. And as I understand it, Mr. Kaeding, you do not have training in these areas, is that correct?

A. Correct.

Q. Okay. Presenting a persuasive argument can be difficult. It requires one to synthesize a case's facts and the law and account for the jurors' perspectives to advance a client's position most effectively. Again, lawyers have training in that area and non-lawyers don't.

Do you understand that?

A. Yes.

Q. Okay. And knowing how to respond to objections or arguments the Government makes can be difficult.

In trial or a hearing, for example, a lawyer has the education, training and experience to think on her feet and respond in the moment. We don't have the time particularly in a trial, at least ordinarily, to recess and come back and give someone the time to think through how they might best respond to an argument or a question or an issue. Again, that kind of thinking on one's feet is something that lawyers are trained to do and they have experience doing it and that experience is unique to them.

Do you understand that?

A. Yes.

Q. Okay. So do you understand, I guess, Mr. Kaeding that the right to representation by counsel is a valuable right?

A. Yes, I do. My concern is that this case is unique and only I know the unique aspects of many of the things that we're going to talk about.

Q. All right. But you understand that in general, the right to counsel is a valuable right that is really cherished in our criminal justice system?

A. In general, yes.

. . .

Q. Do you understand, sir, that it's possible at trial that you might not think to make an argument or you might miss an argument that you should have made, or that a lawyer might have very well have made if a lawyer had represented you?

A. Again, this is where my familiarity with the case is more important. A lawyer wouldn't know all the details facing with this PPP process, so I would be better able to catch an argument or make an argument than an attorney would because they haven't studied this and don't know the details as well as I do.

Q. Do you mean the facts, or do you mean the law, or do you mean both?

A. No, I mean the facts relevant to the case.

Q. All right. Do you understand, sir, that it's very possible that you might miss an argument the law gives you the ability to make?

A. I understand that.

Q. Okay. So—well, let me ask the sort of flip side of the coin. Do you understand that there's a risk here that if you say something or present an argument that a lawyer would think unwise, you may do something disadvantageous to yourself?

(Pause)

A. I understand that.

Q. So the bottom line, then, Mr. Kaeding, at least on this topic that we are talking about here, is that while you have the constitutional right to self-representation, you understand that it's very possible here that that might lead to a worse outcome or result than you might have obtained had you been represented by counsel?

Do you understand that?

A. I understand that.

. . .

Q. And you know that I—you probably can tell from the tone of or the nature of the questions that I'm asking you that I think that this is a bad idea.

A. Yes. I've been told that by a magistrate as well.

Q. And you are nonetheless insistent on exercising your constitutional right, which you have, to represent yourself in this case?

-11-

A. Yes, Your Honor.

Q. Okay.

R. Doc. 201, at 8–19. Based on this discussion, the district court found that Kaeding knowingly, voluntarily, and intelligently waived his right to counsel.

Also, during this hearing, the court addressed Kaeding's discovery concerns, including his request for a continuance to complete discovery. Kaeding claimed that certain discovery information was lost in transport and he was unable to access evidence seized from his daughter. In reply, the district court encouraged Kaeding to work with the government to obtain that information. The district court then granted Kaeding a 30-day continuance to July 22, 2024. The district court also ordered an independent medical examination for Kaeding.

### D. *Trial and Sentencing*

Trial began on July 22, 2024, with the district court addressing the government's motion to substitute the transcription services with a headset to obviate transcription. Based on evidence of Kaeding's prison phone calls, the court granted the government's motion and provided Kaeding a headset rather than live transcription for the remainder of the trial.

The government called seven witnesses. These included the interviewing officer during the search of Kaeding's home. The officer played clips from the interview with Kaeding. During a break in cross-examination of the government's final witness, Kaeding requested that one of his standby counsels be reappointed, and the district court granted that request and reappointed both standby counsel.

On July 30, 2024, standby counsel filed a motion asserting Kaeding's Fifth and Sixth Amendment rights had been violated. The district court denied this motion for failing to describe the specific relief sought and because the motion's factual assertions were not credible. After being reappointed, Kaeding's counsel moved for

a mistrial, which the court denied. After the government rested, Kaeding took the stand. Following the close of trial, the jury found Kaeding guilty on all charges.

The probation office's presentence report (PSR) suggested an enhancement under U.S.S.G. § 3C1.1 for obstruction of justice. The PSR concluded that Kaeding's travel to, and continued stay in, Colombia constituted willful and deliberate conduct attempting to "obstruct or impede, the administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction." U.S.S.G. 3C1.1. Kaeding objected to this enhancement. The court overruled the objection.

At sentencing, the district court imposed a total sentence of 87 months' imprisonment. This sentence included concurrent sentences of 63 months' imprisonment for wire fraud and money laundering and an additional 24 months' imprisonment for the aggravated identity theft convictions.

## II. *Discussion*

On appeal, Kaeding brings a series of challenges. First, Kaeding challenges the district court's denial of the motion to suppress in relation to his interview with federal agents during the initial search. Second, Kaeding challenges the waiver of his right to counsel and whether it was voluntary. Third, Kaeding challenges his right to a fair trial, specifically regarding the district court's denial of his continuance request, and the denial of certain services leading up to trial and during trial. Fourth, Kaeding challenges the district court's application of the obstruction-of-justice sentencing enhancement.

## A. *Motion to Suppress*

In reviewing a motion to suppress a statement, we review "any factual findings for clear error but consider de novo whether [a defendant's] right to counsel had attached." *United States v. Duggar*, 76 F.4th 788, 792 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 2685 (2024). *Miranda* requires law enforcement to notify arrestees of certain rights prior to taking them into custody and interrogating them. 384 U.S. at 478–79. An individual is in custody for *Miranda* purposes only when "there is a

formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). To determine whether one is in custody we "consider the totality of the circumstances that confronted the defendant at the time of questioning, and inquire whether a reasonable person would have felt that he or she was free to terminate the interview and leave." *United States v. Williams*, 760 F.3d 811, 814 (2014).

We have identified six factors consistently considered in determining whether a defendant was in custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." *United States v. Axsom*, 289 F.3d 496, 500–01 (8th Cir. 2002).

Kaeding asserts that police presence dominated the interview. He notes that they required him to have a police escort to use the restroom. Kaeding also highlights two law enforcement statements during the search. First, agents told Kaeding that he may be arrested if they developed evidence of another crime during the search. Second, they told Kaeding that he would be committing a crime if he did speak not truthfully. The government acknowledges that the police-dominated-environment

factor may favor custody, but it avers that all other factors weigh against custody. The magistrate judge viewed the record similarly, finding that Kaeding was not in custody at the time of the interview.

Upon review, we conclude that Kaeding was not in custody at the time of the interview in his home. The facts resemble two of our prior cases in which we held that the defendants were not in custody. *United States v. Sandell*, 27 F.4th 625 (8th Cir. 2022); *United States v. Ricker*, 983 F.3d 987 (8th Cir. 2020). In those cases, the defendants were told that they were free to end the conversation, were not being arrested, and were not physically restrained. *Sandell*, 27 F.4th at 629–30 (holding all six factors weighed against custody where there were four officers present and defendant was never handcuffed or restrained, even though officers followed him while moving around the house); *Ricker*, 983 F.3d at 993 (holding defendant was not in custody where only two officers had meaningful interaction with defendant and that defendant was free to end the conversation at any time, even though defendant was not allowed to move freely throughout the home). A police-dominated setting is not dispositive when other factors weigh substantially against a finding of custody for interrogation purposes.

### B. *Waiver of Right to Counsel*

"Whether a defendant waived his Sixth Amendment right to counsel involves a mixed question of law and fact, which we review *de novo*." *United States v. Lemicy*, 122 F.4th 298, 305 (8th Cir. 2024). We will affirm the grant of a defendant's motion to represent himself at trial "if the record shows either that the court adequately warned him or that, under all the circumstances, he knew and understood the dangers and disadvantages of self representation." *United States v. Patterson,* 140 F.3d 767, 774–75 (8th Cir. 1998).

The Sixth Amendment's right to counsel "necessarily implies the right of self-representation." *Faretta*, 422 U.S. at 832. Through self-representation, the defendant "relinquishes . . . many of the traditional benefits associated with the right to counsel." *Id.* at 835. Thus, "to represent himself, the accused must knowingly and

intelligently forgo those relinquished benefits." *Id*. (citation modified). And while "a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation," the court should still make the defendant "aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id*. (quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942)).

Kaeding contends that the poor performance of his appointed counsel necessitated his decision to represent himself. He chose to do so only after the district court denied his motion for substitute counsel. He thus claims his "decision to represent himself was not truly voluntary, but rather the product of the Hobson's choice of being represented by an attorney he did not like or trust or proceeding *pro se*." Appellant's Br. 44. Kaeding does not contend that his appointed counsel was unprepared, only that he was frustrated with their performance. The record shows that Kaeding and counsel did have disagreements. It does not, however, show that counsel was either unprepared, uncooperative, or ineffective.

The government points to our caselaw describing the "Hobson's choice" between adequate representation and self-representation as not constitutionally difficult. *See United States v. Ladoucer*, 573 F.3d 628, 634 (8th Cir. 2009). *Ladoucer* recognizes that unprepared counsel is cause for concern, but Kaeding did not show that his counsel was unprepared. Being "represented by an attorney he did not like or trust" does not rise to the level of having unprepared counsel, particularly where facts do not support the dislike and distrust, nor did they show a negative impact upon the representation provided. The magistrate judge observed that Johnson did good work for Kaeding. Kaeding's displeasure that Johnson did not do all he requested, without more, is not inadequate representation.

Further, both the magistrate judge and the district court judge conducted in-depth *Faretta* inquiries, consistently warning Kaeding that representing himself was a "bad idea" and that he would face challenges trying to prepare while being

imprisoned. However, Kaeding adamantly maintained that he wanted to represent himself, despite recognizing both judges believed it was unwise.

We conclude that the district court's decision allowing defendant to represent himself following a thorough *Faretta* inquiry should be upheld. *See United States v. Woods*, 137 F.4th 900, 906–07 (8th Cir. 2025) (holding that a *Faretta* inquiry was sufficient where the district court advised defendant against proceeding pro se, notified him of certain limitations on discovery, and did not notify defendant of the limits of standby counsel). Additionally, there is no evidence that Johnson was either unprepared or ineffective in his role as counsel. Thus, there was no constitutional violation in allowing him to remain as counsel.

## C. *Right to a Fair Trial*

Kaeding argues that the district court's denial of his motion for a continuance and motions for change of custody amounted to constitutional violations because the denial prevented him from receiving a fair trial. He also argues that the denial of the transcription services prejudiced him and furthered his unfair trial.[4]

### 1. *Denied Continuance*

We will not overturn a trial court's continuance denial unless it has abused its discretion. *United States v. Weisman*, 858 F.2d 389, 391 (8th Cir. 1988) (citing *United States v. Wolf*, 645 F.2d 665, 667 (8th Cir. 1981)). "Continuances are not favored and should be granted only when a compelling reason has been shown." *Id.*

---

[4]The government raises concern that Kaeding did not move for a new trial prior to his notice of appeal. It argues that the remedy for failure to grant a continuance or a particular trial accommodation would be a retrial, but that by failing to seek a new trial, the defendant forfeited those arguments. As a result, the government argues that we should review the district court's failure to grant sua sponte a new trial for plain error. *See United States v. Ruzicka*, 988 F.3d 997, 1007 (8th Cir. 2021) (citing *United States v. Calhoun*, 721 F.3d 596, 600 (8th Cir. 2013)). Kaeding does not address this in his reply. Because we find that the district court did not abuse its discretion in denying Kaeding's request, we decline to address whether the district court should have granted a new trial on these issues.

When determining whether to grant a continuance, district courts "must balance the asserted need for the continuance against the hardship of the resulting delay, and should also consider the complexity of the case, the diligence of the party requesting a continuance, and the conduct of the opposing party." *United States v. Farlee*, 757 F.3d 810, 821 (8th Cir. 2014).

This case had already been continued, at Kaeding's request, on multiple occasions. *See United States v. Gantne*r, 3 F.4th 1002, 1006 (8th Cir. 2021) (upholding the denial of a continuance where the case had had already faced delays by numerous defense motions); *Weisman*, 858 F.2d at 391 (upholding the denial of a continuance where a pro se defendant decided to represent himself weeks before the trial, had ample time to prepare, had been granted three continuances and did not show that he was "unable to do anything at trial that he would have been able to do with additional preparation"). Nearly a year had passed between the August 2, 2023 motion when Kaeding directed his counsel to withdraw and the July 22, 2024 trial. This gave significantly more time than the "weeks" in *Weisman* in which we upheld a denial of a continuance.

Kaeding argues that his lack of access to discovery hampered his self-representation. He specifically references his lack of access to the materials on his daughter's computers that were subpoenaed by the government. However, as the government points out, these materials were never searched and therefore the contents were not a part of discovery. Nor did Kaeding provide any evidence of a personal ownership interest in his daughter's records to justify him accessing or reviewing the materials.

Further, the government did provide, on more than one occasion, the relevant Rule 16 materials in both paper form and by computer disc to Kaeding's standby counsel. Kaeding had access to the discovery materials, and he has not shown that the discovery materials should include the materials obtained from his daughter. Nor was there any motion to compel such discovery. He also has not tried to demonstrate how his trial preparation would have been different with such materials. During trial,

he referred to worksheets that were on his daughter's computer which, he claims, justified the information within the loans. However, Kaeding never provided such explanation to the court for consideration, but only to the jury for determination of guilt.

Ultimately, based on the discretion afforded to district courts and Kaeding's ample time to prepare for trial, we discern no abuse of discretion in denying the continuance requested on the eve of trial.

## 2. *Denied Services in Prison and Trial*

Kaeding further argues that he did not receive a fair trial because he did not have access to certain services while imprisoned and during trial. Kaeding complains that his health-related prison transfers curtailed his access to communications, the law library, and discovery. To remedy these deficiencies, Kaeding sought multiple reconsiderations of detainment in which he sought to be released from custody. These motions were denied. However, the magistrate judge, in denying Kaeding's motions, took great care that Kaeding still had multiple accommodations. In denying Kaeding's motions for reconsideration of detainment, the magistrate judge instead transferred Kaeding to ensure that he had better access to healthcare. And to address the concerns regarding access to law-related resources, the magistrate judge ensured that standby counsel would assist with research and provide materials to Kaeding as needed.

Further, Kaeding complains that during the trial, he was prejudiced by the lack of real-time transcription services. While we have not faced the issue, other courts have. As those courts did, we will review the denial of particular trial accommodations for abuse of discretion. *See, e.g.*, *United States v. Johnson*, 248 F.3d 655, 661 (7th Cir. 2001); *United States v. Edouard*, 485 F.3d 1324 (11th Cir. 2007). While Kaeding had been diagnosed as having "profound sensorineural hearing loss and a poor word recognition score," the government moved to remove his transcript services. As support, the government played clips from Kaeding's phone calls while in custody. These calls showed Kaeding participating in phone

calls without any transcript or similar service. In light of this, the district court, the day before trial, removed the transcription service and replaced it with an amplification device.

Kaeding argues that the lack of transcription services prejudiced him because, as he was self-represented, it was critical that he heard every word. Kaeding then points to multiple comments on the record where he verbalized that the microphone or headset was not working or that he could not hear the individual speaker. However, Kaeding failed to point to any specific instance of prejudice from having to ask people to repeat themselves. In fact, these instances indicate that Kaeding was comfortable stopping the record to express that he was having issues with the device and cure such issues. On this record, we conclude that the district court did not abuse its discretion in denying these services and replacing them with an amplification device.

D. *Obstruction of Justice*

We review a district court's application of the Sentencing Guidelines by first determining whether the district court properly calculated the Guidelines range, reviewing factual findings for clear error and application of the Guidelines de novo. *United States v. Belfrey*, 928 F.3d 746, 750 (8th Cir. 2019). As relevant here, § 3C1.1 of the United States Sentencing Guidelines provides for a two-level increase in offense level if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." The Application Notes contain examples of conduct to which the adjustment does and does not apply. They indicate that the enhancement does not generally apply to "avoiding or fleeing from arrest," U.S.S.G. § 3C1.1, n.5(D), but does apply to "willfully failing to appear, as ordered, for a judicial proceeding," *id.* at n.4(E). Further, "[t]he district court has broad discretion to apply section 3C1.1 to a wide range of conduct." *United States v. Collins*, 754 F.3d 626, 629 (8th Cir. 2014) (quoting *United States v. Billingsley,* 160 F.3d 502, 506 (8th Cir. 1998)).

The PSR suggested adding the § 3C1.1 enhancement based on Kaeding fleeing to Colombia and his conduct while in Colombia, such as evasion of local authorities and false statements regarding his physical condition and wife's alleged presence with him. Kaeding claims that he was not obstructing justice because he asked his counsel at the time and that counsel verified that he was not subject to travel restrictions, and he maintained contact while abroad. He claims that, through counsel, he expressed a desire to return to Minnesota around May 2021 but was prevented by the COVID-19 pandemic. However, his claim was uncorroborated. Rather, the record suggests that Kaeding willfully remained in Colombia until November 2021 and refused to return until forced by the government and Colombian immigration action.

We have held that "a district court can find that a defendant consciously acts with the purpose of obstructing justice—that is, acts willfully—when his misconduct occurs with knowledge of an investigation, or at least with a correct belief that an investigation is probably underway." *United States v. Chavez*, 833 F.3d 887, 889 (8th Cir. 2016) (citation modified). When Kaeding left for Colombia, and chose to stay in Colombia, he knew that there was an ongoing investigation and he would likely be needed. Kaeding, nonetheless, attempted to evade law enforcement by staying in Colombia for an extended period and long after any claimed concerns of COVID-19. Thus, the district court properly applied the § 3C1.1 enhancement.

III. *Conclusion*

For the foregoing reasons, we affirm the district court's decision.

_____

-21-